## TIFFANY *v.* LUCAS.

1. A sale by a person in fact insolvent and made within six months of a bankruptcy subsequently decreed, is not necessarily and without regard to its character, void under the 35th section of the Bankrupt Act.

2. If it was made in good faith, for the honest purpose of discharging debt, and in the confident expectation that by so doing the person could continue his business, it will be upheld. On the contrary, if he made it to evade the provisions of the Bankrupt Act, and to withdraw his property from its control, and the vendee either knew or had reasonable cause to believe that the vendor's intention was of this character, it will be avoided.

3. Thus two things must concur to avoid the sale: the fraudulent design of the bankrupt and the knowledge of it on the part of the vendee, or reasonable cause to believe it existed.

APPEAL from the Circuit Court for the District of Missouri; the case being thus:

Lucas purchased in April, 1869, from Darby (then in debt) a piece of real estate in St. Louis: the deed being made on the 24th of that month. At a meeting of Darby's creditors, held on the 17th of June following, he was told by them that he must file his petition to be adjudged a bankrupt, or that he would be forced into bankruptcy. On that day he discontinued business, and on the 1st of July presented his petition praying to be adjudged a bankrupt, and on the 12th following was adjudged a bankrupt accordingly; one Tiffany being appointed his assignee. Tiffany soon afterwards filed a bill in the District Court for the District of Missouri,

to avoid the sale to Lucas as made in contravention of the 35th section of the Bankrupt Act. That section is thus:

"If any person, being insolvent or in contemplation of insolvency or bankruptcy, within six months before the filing of the petition by or against him, makes any payment, sale, assignment, transfer, conveyance, or other disposition of his property to any person who then has reasonable cause to believe him to be insolvent, or to be acting in contemplation of insolvency, and that such payment, sale, assignment, transfer, or other conveyance is made with a view to prevent his property coming to his assignee in bankruptcy, or to prevent the same from being distributed under this act, or to defeat the object of, or in any way impair, hinder, or delay the operation and effect of, or evade any provision of this act, the sale, assignment, transfer, or conveyance shall be void. . . . And if such sale, assignment, transfer, or conveyance is not made in the usual and ordinary course of business of the debtor, the fact shall be *primâ facie* evidence of fraud."

The question, of course, was whether the sale had been made under any of the circumstances mentioned in this section. The facts seemed to be these:

The property was confessedly valuable. It was a large lot, at the southwest corner of Olive and Fifth Streets, St. Louis, 75 feet front on Fifth Street by 127 deep, with three marble stores, five stories high, upon it; that it had cost near or quite $100,000 to build; the position being by some thought, from their judgment as to the course trade in St. Louis was likely to take, and of prospective values, to be the best in that growing city; and by a few regarded even as such for its present advantages, though the general judgment was that a neighboring corner—the corner of Olive and Fourth—was at that time a better situation than this. Whatever was its relative advantage, its positive value was attested to in many ways. Among them, by the fact that in the summer of 1868, Darby wanting to borrow $150,000 on mortgage of an insurance company in Philadelphia on this property, Lucas, who had long lived in St. Louis, was possessed of great wealth and was particularly conversant with

the values of real estate, along with a certain Britton, president of the National Bank of the State of Missouri, also very conversant with values, gave him a certificate thus:

"Having been called upon by Mr. Darby to estimate and state the value of his property in the city of St. Louis, on the southwest corner of Olive and Fifth Streets [description], we state that we are well acquainted with it, and that we consider it *well* worth the sum of $300,000. We value the same accordingly at that sum.

"J. H. LUCAS.

"J. H. BRITTON.

"ST. LOUIS, September, 1868."

Lucas in buying the property paid $50,000 in cash, and assumed to pay the mortgage of $150,000, which had five years from November, 1868, to run, and bore interest at 8 per cent. a year. The mortgage required the owner of the property so long as it remained unpaid to keep the stores insured to the extent of $100,000. *After* the sale to Lucas was completed, there were different persons who said to Darby that they could have found a man who would have given more; "fellows," said Darby, "who came around and talked." One of them made mention particularly of a certain Robert Campbell, a man of property, who he said would have given more. But Campbell had never offered more. Darby had in fact, in a private way, been trying unsuccessfully for some time to sell the property. Certain persons testified, on the other hand, that in their opinion Lucas had given as much as the property was worth, in the then state of prices for real estate at St. Louis, where anticipations prevailed, among several persons, of a prompt return to specie payments, an event which, if it should occur, the dealers in real estate supposed would cause a great fall in the values there of that kind of property. Assuming, as the fact seemed to be, that productive real estate in the best parts of St. Louis commonly yielded 6 p. c. on its cost, and that money was worth 8 p. c. (the rate paid on the mortgage of $150,000), the rental of this particular property during a year that Lucas held it, indicated that the price, so far as

present income, and estimates divested of anticipations of future value were concerned, was not unfair.   Thus—

| | | |
|---|---:|---:|
| The gross rental was, . . . . . . . | | $17,500 |
| Deduct interest on $200,000 at 8 p. c., . . | $16,000 | |
| Insurance, $100,000 at say ¾ of 1 p. c., . . | 750 | |
| Taxes (in 1869), . . . . . . | 2,900 | |
| Repairs, agency, care of the buildings, &c. (say), | 350 | |
| | | 20,000 |
| Loss of annual income, compared with income | | |
| from $200,000 personally, at interest at 8 p. c., | | $2,500 |

In fact the buildings, though very costly, had been injudiciously arranged.   Adverting to the small income from the rents, witnesses who estimated the property at $300,000, and even $330,000, conceived that a 6 p. c. rental on that sum could soon be had, if about $10,000 were laid out in "gutting" part of the buildings and changing the plan.

When Lucas purchased the property of Darby there was just coming due to the insurance company six months' interest ($6000) on the mortgage given by Darby.   This, and also the State and county taxes for the current year, Darby promised to pay.   The former, he did pay; the latter, inasmuch as the collector did not come round until after he was bankrupt, when he was unable to pay, Lucas had to discharge.

The first movement in regard to the sale came from Darby, through one Hogeman.   This Hogeman was cashier of the Boatman's Saving Bank, of which Lucas was a director—an "ornamental director," as he styled himself,—who "did not by any means consider himself responsible for what was done, and who went there more for the sake of getting the news than anything else."   This same bank had been for a long time in the habit of discounting (when it was well indorsed) Darby's paper, and its cashier thus knew that Darby was always pressed for ready money.   In this way, Hogeman stood in a sort of friendly relation to both the parties, and to both had apparently good feelings.   Darby talked with Hogeman confidentially.   "I told him," said he, "that I wanted to sell my property and settle my debts and quit-off everything; and I asked him to sell it for

me if he could, and do all that he could to sell it for me; and he promised to do it." Hogeman then offered the property to Lucas, and urged him to make a proposition. Lucas after a certain time offered $50,000. Darby wanted him to assume the payment of the taxes, $2900, for the current year. This he refused to do. He would give $50,000 and assume nothing but payment·of the mortgage of $150,000. Things remained a few days, when Hogeman advised Darby to accept the offer. He said he thought that more could not be got; that the sum offered would enable Darby "to get out of debt, pay all up, square out, and relieve himself, and go on and sell out the residue of his real estate." Darby accordingly accepted the offer. A few days after that the parties met. Darby prepared and executed a deed for the property; Lucas filled up and signed a check for $50,000; not retaining any part of this purchase-money to pay either the $6000 interest now payable on the mortgage or the $2900 taxes for the current year then partially due. Hogeman received $500 from Darby for his services.

Thus, in the transaction itself, there seemed nothing that condemned it. The matters which involved it in question were certain facts indicative of Darby's condition and intent, which it was supposed by his assignee and general creditors *must* have been known to Lucas, and, if known, showed that he purchased knowing that Darby contemplated bankruptcy.

The case, in regard to these, seemed thus:

On the one·hand, Darby, who had settled himself in St. Louis many years ago as an exchange broker, doing banking business also, was testified to be "a man of wonderful energy and capacity for business." He had failed in the fiscal crisis of 1841–2, but "worked through that dismal season, lost some of his property, but saved part and got soon on his feet again." In the next fiscal crisis, which was A.D. 1857, "he encountered enormous losses, went under for a while, out in the end came up and paid his debts with 10 p. c. interest;" so that in 1864 he was again afloat, and in

1867-8-9, a hopeful, active, and popular man of business—a broker and banker—on the full tide of money-making experiments, in various sorts of ways. He had some of the most valuable real estate in that large and growing city, including the property now in controversy and other valuable property in Main Street. He owned a lead mine also, in Missouri, from which in one year the yield was $33,000, and which would have been a source of income to him had it not been managed by fraudulent agents. His rents from his city property in inflated times, as *ex. gr.*, prior to 1857, and in that year, amounted to between $40,000 and $50,000. His probity and honor were conceded. He had warm friends; among them Dr. Brotherton and Mr. Knox, the latter of whom had once been his partner, and knew him well; men of character and property both, and who had apparently such confidence in his capacity and resources that they indorsed his paper continually and for large sums, believing, as would seem, that though embarrassed he would bear himself up and in the end come out sound, so far at least as entire solvency was concerned. At the very time of his suspension he had depositors on his books to the extent of $170,000; among them Mr. Polk, a leading member of the bar at St. Louis, for $40,000, and Mr. Inge for $10,000. When Mr. Knox, who was a lawyer and gentleman of standing, was asked by the president of the Boatman's Savings Bank, which, as already and hereafter mentioned, was constantly discounting Darby's paper at rates of from 10 to 18 p. c., whether Darby was good, Mr. Knox replied that he was perfectly good, " as good as anybody." None of his paper ever got to protest, and he paid all his obligations as they came due. He appeared to have kept his efforts to raise money and all facts which might destroy his credit in a remarkable degree from the public generally; so that even persons in the walks of business seemed not much informed of the shifts to which he was driven. Mr. Britton, already named, president of a bank and an intimate acquaintance for years of Darby's, " could not say " that he regarded him for two or three years before his failure in imminent danger

of failing, and " was a good deal surprised when he heard that he had failed." He had, however, not gone now *voluntarily* into bankruptcy. On the contrary, though he had stopped payment and called his creditors together, he sought an extension; stating that with time he could pay all. It was one of his creditors, Mr. Polk, his largest depositor, who considered that he could not go on, and that the only safety of the creditors was an immediate winding up under the eye of a court of bankruptcy.

On the other hand, he seemed to be one of that class of persons—more or less known in all of the large cities of our country—who beginning with little or no capital, are yet doing from the outset a large business; always borrowing, or trying to borrow money; periodically failing, but never, as they consider, broken; or if broken in the end, broken only by other people, and by some *vis major* of commercial vicissitudes, for which, in their judgment, even the most prudent man is not responsible in the eye of discretion.

Thus the whole cash capital of Darby when after his failure in 1857 he set up the business of a banker in 1864, was $5000. For the rest he "did business on deposits." Though thus banking, and banking therefore in a way where credit was of supreme importance to him, his notes, continually prior to 1869, were in the hands of different street brokers—three or four at least—and often sold at from 1 to 1½ per cent. a month. All his real estate was incumbered to the fullest extent to which he could incumber it; the mortgages on it generally overdue. He had been paying as high as 10 per cent. interest on deposits. All the money he had on deposits, both in St. Louis and New York, was $800. He had no stocks or bills receivable. For six months before his suspension he had been discounting his rents. For three or four years before he suspended he had lost about $25,000 a year in his business; for two or three years prior to 1869 he had paid about $40,000 a year in usury. At the time of his suspension he had $50,000 of accommodation paper out.

His cashier and bookkeeper from 1866 up to the time of

his suspension was examined as a witness.  His testimony gave a view of the interior conduct of the bank.  The witness said in substance:

"I thought Mr. Darby was much embarrassed for two years before his failure.  I judged so from the appearance of his cash and the trouble he had in getting money.  From the time I went into his employment, he was in the constant habit of raising money through street brokers.  Some of the checks drawn by his depositors were honored only after hesitancy; he sometimes had to get the money to pay them.  Mr. Darby had a very small amount of cash on hand at any one time.  I do not suppose that he ever had over $5000 on an average.  Some five or six months before he failed I had to go to pay a check after banking hours at the Second National Bank.  The check was for $150 or $175.  During the last year he was in business, ten or twelve checks were presented when we had not money to meet them.  I know it plagued me very often a great deal.  It vexed me to think we had to put them off.  I was often asked for a year or two before his failure if he was not much embarrassed.  Of course, I always denied it, in order to save his credit.  I do not know that anybody outside of his office knew of the shifts to which he was forced to resort for ready money.  Five or six months before his failure he was uneasy about one of his depositors, Mr. Polk (who had a deposit of $40,000), calling for his money.  It was payable on demand.  He said that it would break him if Polk called on him as he expected that he would; that he would have to hurry round to see if he could make a raise of the money, and he did not know how he would raise it.  He always remarked that he was trying to sell his lead mines; that if he could only sell them for $100,000 he could meet these things.  His money on hand would not average over $5000; possibly he might have $5000 to-night, and $100 the next night; the next day he might have $10,000, and it would be drawn out before twelve o'clock next day.  He had no great deal of money at the East—very little—for a year before his failure.  He sold exchange on the East when he had no funds there, and then raised money to meet it.  This he did a year before his failure; it became more common as early as the February before his failure.  There was no entry on the books of the notes sold by street brokers.  Very few active business men.

had deposits there. His capital was $5000. Besides Mr. Polk's deposit of $40,000, Mr. Inge had a certificate for $10,000 also payable on demand. Polk called for $10,000; Mr. Inge never called for his."

On the other hand again, it was stated by this same witness, that when Darby without money there was thus drawing time-drafts on New York—"kiting"—to raise money for present urgent demands at St. Louis, he sold those drafts—in one instance two, amounting to $7500—" at the usual rates, . . . the regular rate of exchange at the time;" and this to banks; the Third National and· the Traders'. Whether they were indorsed, and if so by whom, did not appear in the testimony.

Both Darby and Lucas were examined as witnesses, the former by the assignee; the latter for himself.

In regard to Darby the following questions and answers were made:

"Q. Were you in contemplation of bankruptcy at any time exceeding two months ·before you actually were compelled to take the benefit of the bankrupt law?·

"A. I never thought of going into bankruptcy at all.

"Q. You always expected to settle up your debts and pay your creditors?

"A. That was my object, and I called my creditors together here, and asked them to let me settle up my debts;·that I could do it, and that I had no expectation of going into bankruptcy.

"Q. Then you had no contemplation of going into bankruptcy when you stopped?

"A. Not when I stopped; but when I called my creditors together, I asked them to let me do this. Mr. Polk made a speech and said it could not be done, and they passed a resolution that I should go into bankruptcy, and that is the reason I went.

"Q. At the time you made this conveyance to Mr. Lucas, you had no expectation of going into bankruptcy?

"A. No, sir."

So Lucas. The ·bill filed by the assignee to set aside the ·sale, had charged that Lucas retained $6000 (the amount ·due for interest on the mortgage at the time of the sale) out

of the $50,000, the consideration of the sale, lest Darby should not pay it. The following questions and answers were now made.

"Q. Is this true?

"A. No, it is not; I never had the least idea of Mr. Darby's not paying it. The proof is that I paid him a $50,000 check without reservation of any kind. I have always thought Mr. Darby an honorable man—a man in business that could be relied upon. That was my opinion all the time, and I acted with him as I would with any other gentleman that I thought would be a punctilious business man.

"Q. State if you had confidence in his solvency also?

"A. I had, I assure you; it never occurred to me to think otherwise; I knew he had been embarrassed and borrowing money, but some of the best men in town indorsed for him, who were said to be perfectly good; stood by him, and I suppose knew more of his business, and would not have done it if they had not known that they were justified in so doing.

"Q. Had you any intimation that Mr. Darby was in bankrupt circumstances?

"A. No, sir; none whatever. I had no intimation from any quarter, except if it should be that a man's paper is selling on the street, and some person might think that is an evidence; but I know from my own experience that a man may sell his paper on the street at a great sacrifice and still not be broke, by any means.

"Q. When did you first receive any intimation or knowledge that Mr. Darby was a bankrupt?

"A. I do not recollect how long it was; but some time after the transaction I had with him."

The answer to the bill which had charged the insolvency of Darby at the time of the sale, and Lucas's knowledge of it then, ran thus:

"The respondent further answering says that disclosures and information subsequent to the date of the deed, have led the respondent to the conclusion that the said Darby was, at the time of making said deed, in insolvent circumstances, but at the time when the said deed was made and delivered, and the said con-

sideration paid, he, the said Lucas, had no suspicion or belief that the said Darby was in failing or insolvent circumstances, or in contemplation of bankruptcy or insolvency; nor had the said Lucas any reason to believe the said Darby to be insolvent, or to be acting in contemplation of insolvency at the time when the said sale and conveyance were effected, nor until a long time thereafter. On the contrary thereof, the said Lucas had been for many years acquainted with the said Darby as a banker, and the owner of valuable real estate in and about the city of St. Louis, and considered him a wealthy man. He knew that the said Darby had incumbered some of his real estate in furtherance of his business as a banker, but regarded such action on the part of the said Darby as indicating merely his, the said Darby's, belief that the profits he could make as banker out of the money borrowed, would exceed the interest he would pay therefor."

Speaking of the value of the property, Lucas said "that at one time Fifth Street looked as if business was going to run off of Fourth; but that this had been changed. Still that Fifth Street would come out in the long run, and that this would be one of the best pieces of property on it; that it was so now; but that the house was not well-planned, not planned as such a house ought to be; that it should be planned in a way greatly different, when it would be worth much more; but that he did not notice that till after he had bought it." Lucas had heard "that *somebody* had offered $300,000 for the property, but he never knew who that was." Darby, however, testified that he had never been offered $300,000 for the property, and that what Lucas heard was a mistake.

Britton, who with Lucas had given the certificate (*supra*, p. 412), when Lucas wanted to borrow money on the property, that it was well worth $300,000, was also examined. He said:

" I have this to say in regard to this certificate: I have been frequently called on to value property that way where parties made a loan, and where it was understood distinctly that they gave 50 per cent. only of the value of the property, and there-

fore I have been liberal in these valuations, and so stated to the parties where they have been made."

The District Court, where the bill was filed, dismissed it, and the Circuit Court affirmed the decree. The question here on appeal, where the matter was fully argued, was whether such action was right.

*Mr. S. Knox, for the appellant; Mr. T. Gantt, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

There would seem to be no difficulty in ascertaining the meaning of Congress on the subject embraced in the 35th section of the Bankrupt Act (in contravention of which this sale is alleged to have been made), in its application to this case. Clearly *all* sales are not forbidden. It would be absurd to suppose that Congress intended to set the seal of condemnation on every transaction of the bankrupt which occurred within six months of bankruptcy, without regard to its character. A policy leading to such a result would be an excellent contrivance for paralyzing business, and cannot be imputed to Congress without an express declaration to that effect. The interdiction. applies to sales for a fraudulent object, not to those with an honest purpose. The law does not recognize that every sale of property by an embarrassed person is necessarily in fraud of the Bankrupt Act. If it were so, no one would know with whom he could safely deal, and besides, a person in this condition would have no encouragement to make proper efforts to extricate himself from difficulty.

It is for the interest of the community that every one should continue his business, and avoid, if possible, going into bankruptcy, and yet how could this result be obtained if the privilege were denied a person who was unable to command ready money to meet his debts as they fell due, of making a fair disposition of his property in order to accomplish this object.

It is true he may fail, notwithstanding all his efforts, in keeping out of bankruptcy, and in that case any sale he has

made within six months of that event is subject to examination. If it shall turn out on that examination that it was made in good faith, for the honest purpose of discharging his indebtedness, and in the confident expectation that by so doing he could continue his business, it will be upheld. On the contrary, if he made it to evade the provisions of the Bankrupt Act, and to withdraw his property from its control, and his vendee either knew, or had reasonable cause to believe, that his intention was of this character, it will be avoided. Two things must concur to bring the sale within the prohibition of the law: the fraudulent design of the bankrupt and the knowledge of it on the part of the vendee, or reasonable cause to believe that it existed.

The evidence in this case, fairly weighed, negatives both these conditions. If Darby's conduct was unwise, it was prompted by correct motives. There could have been no intention, on his part, of violating any of the provisions of the bankrupt law, for he did not contemplate the necessity of going into bankruptcy. His action was not based on the idea, even, that he was in a bankrupt condition. On the contrary he believed his property, if converted into money, would pay his debts, and this belief induced him to set to work to accomplish that object. There was no thought of preferring one creditor over another, because he was convinced of his ability to pay all. In the execution of his purpose to sell his property and pay his debts, the sale was made to Lucas, and it cannot be impeached because it turns out that Darby was mistaken in his calculations. There is no arbitrary rule by which the good faith of a transaction can be tested. It may be that ordinary men in similar circumstances would have acted differently, but this is no reason to condemn the conduct of men like Darby. Possessed of uncommon energy and great business capacity; having in previous crises of his fortune surmounted difficulties of equal, if not greater, magnitude, he was not appalled by a state of affairs which, to a man not above the common level would have been a hopeless undertaking. That he failed proves nothing, for other men, whose integrity was

above suspicion, have also failed. It would have undoubtedly been better for some of his creditors if he had taken a less hopeful view of his situation, but they cannot on this account attack the sale in controversy. It was made in good faith for an honest purpose, and is not within the condemnation of the law.

If Darby did not intend to defraud his creditors by withdrawing his property from the operation of the Bankrupt Act, it is not easy to see how Lucas can be charged with aiding him to do it, even if at the time he suspected his insolvency. But it is unnecessary to consider this point, for, in our opinion, the evidence fails to establish that, at the time Lucas purchased the property, he had reasonable cause to believe Darby to be insolvent, or to be acting in contemplation of insolvency. If he believed him insolvent, why trust him to pay six thousand dollars due for interest in a few days after the sale, instead of retaining in his own hands enough money to pay it. His conduct on that occasion cannot be explained on the theory of his belief in Darby's insolvency; but we are not concerned with his actual belief on the subject. The real inquiry is, had he good grounds for believing that insolvency existed. It appears that Darby's banking paper had been met up to the date of the sale, and it is a fair inference that the real estate paper secured by deed of trust, which was overdue, remained in that condition by consent of parties. Britton, the president of the National Bank of the State of Missouri, located in St. Louis, considered Darby to be wealthy, and was a good deal surprised when he heard of his failure. This reputation for wealth was not confined to Britton, but was shared by others on account of a supposed ownership of a large amount of real estate. The Third National Bank and the Traders' Bank, a short time preceding the sale, took his exchange on New York at the usual rates, and others dealt with him as if he were entirely solvent. Polk, a leading lawyer of the city, held his certificate of deposit for forty thousand dollars, and Knox and Brotherton, prominent citizens, were in the habit of indorsing his paper. These parties, from their

course of dealing, of necessity regarded him as a solvent man. If so, why should Lucas suspect his condition to be otherwise?

All of them had equal opportunities with Lucas of knowing his real condition, and some far better, for Knox and Brotherton were on terms of intimacy with him, while Lucas was not. If they were ignorant of the exact state of his affairs, how can Lucas, with less familiarity with them, be supposed to be in a different condition. It is claimed, however, that Lucas is chargeable with notice that Darby's paper was in the hands of street brokers, because the Boatman's Institution, of which he was a director, purchased it from them, and that paper put on the street in this manner is evidence that the maker is insolvent. This conclusion by no means follows, for a man may sell his paper on the street at a great sacrifice to effect a purpose deemed beneficial by him, and still not be insolvent. This proceeding undoubtedly tended to show that Darby was embarrassed, but, if his paper bore the indorsement of good men of reputable standing and recognized wealth, it is reasonable to suppose they were satisfied with his pecuniary status. This supposition is verified in the case of Knox, one of the indorsers, who, when asked by the president of the institution "how good is Darby?" replied, "as good as anybody." It is fair to infer that this information quieted any misgivings which this officer had about purchasing the paper, and that Lucas, with the other directors, was told what Knox said. If so, it is idle to say that the confidence of Lucas in Darby's solvency had nothing to rest on. If it be conceded that the mode of raising money adopted by Darby had a tendency to create distrust in the mind of Lucas, it is nevertheless apparent that the fact of two men of substance indorsing his paper, coupled with the broad declaration of one of them on the subject of his pecuniary condition, was well calculated to remove this distrust and establish his credit.

It is contended, however, by way of impeachment of the good faith of the transaction in controversy, that the property was sold for less than its value, but we are by no means

satisfied that this is so.   The evidence on this subject consists chiefly of the opinions of witnesses upon the relative and prospective values of corner lots upon rival streets. This mode of ascertaining the worth of property is necessarily uncertain and speculative.   It is undoubtedly true that every person who buys property in a growing city like St. Louis expects it to rise in value, and that this consideration is more or less an element in every purchase.   This expectation, however, is more particularly applicable to unproductive and unimproved property.   It rarely occurs that valuable ground in the heart of a city, on which costly buildings are erected, is purchased on any other theory than that it will pay, from the time of its purchase, a fair return on the investment.   Of course the purchaser looks forward to a gradual rise in the value of the ground which will compensate for the deterioration of the buildings, but the basis of the purchase, as a general thing, is the present rental value.   He takes the risk of a change of business from the particular locality, which, as is well known, oftentimes works a serious injury.   There is nothing to show that the property in question was not rented to as good an advantage as it could be, and, clearly, the net income received from it demonstrates that it was not sacrificed.   Besides, Darby had been trying to sell it, but was unable to get more for it. There are plenty of witnesses who say it was sacrificed, but no one is produced, having the ability to buy, who testifies he would have given more for it than Lucas did.   If, as is contended, Robert Campbell, a gentleman of large means, who had the purchase of the property under consideration when the negotiations with Lucas were concluded, would have paid a higher price for it, why is he not called to testify to that fact?   In the nature of things, in a city like St. Louis, if this property could have been sold for more money than Lucas gave for it, direct proof was obtainable to show it.   In the absence of this proof it is a reasonable presumption that the sale cannot be impeached because of inadequate consideration.

It is insisted, however, that Lucas was precluded from

purchasing at a sum less than $300,000, because he certified with Britton, in 1868, on the occasion of the negotiation of the loan of $150,000 by Darby, that the property was worth that sum.  It is undeniable that this certificate was carelessly and loosely signed, because the parties making it had no good reason for saying the property was worth twice the money proposed to be lent on it.  Britton says he makes a practice of regarding values with extreme liberality, when he knows the inquiry is made for the purpose of a loan and the property offered is abundant security for it.  This is all wrong, and cannot be justified by any of the supposed exigencies of business.  Lucas, in vindication of his action, tells us he was unaware at the time of the faulty construction of the building and the small amount of rents received, and, besides, that he had heard that some one had offered the sum named in the certificate for the property, though it turns out no such offer was made.

These things relieve him from the charge of making a certificate with intent to procure for Darby a credit to which he knew him not to be entitled, but they do not furnish a case of justification, as, manifestly, certificates to character or value should not be given unless they are known to be true.  It cannot be doubted, from the evidence, that neither Lucas nor Britton meant to do anything wrong, and, if so, we know of no principle of law which would estop Lucas from disputing the correctness of the valuation named in the certificate in order to show his good faith and fair dealing in his transaction with Darby.

It is hardly necessary to say, in concluding this case, that the sale of real estate by Darby was not out of the usual course of business within the meaning of the Bankrupt Act.

DECREE AFFIRMED.