### JUDSON, Assignee, etc., v. THE COURIER CO.

*(District Court, S. D. New York. July 23, 1881.)*

1. AGREEMENTS BETWEEN CREDITORS—PREFERENCES—REV. ST. § 5128.

A transfer, by one in failing circumstances, of the greater portion of his assets to a creditor is not void under section 5128 of the Revised Statutes, as involving unlawful preference of such creditor, where all known creditors, and all whom the grantee suspected were creditors, and all the creditors of whose existence he was bound to know, joined in the arrangement under which the transfer was made; though such creditor thereby secured a preference.

In Equity.

*E. H. Penn*, for complainant.

*Hamilton Cole*, for defendant.

BROWN, D. J. This action was brought to have declared void a transfer of the effects of Montgomery Queen, a bankrupt, to the defendant, one of his creditors, made on October 27, 1877, and to recover the proceeds, or the value thereof.

The proceedings in bankruptcy were commenced by petition of the bankrupt on February 8, 1878, and the plaintiff was thereafter duly appointed his assignee.

In October, 1877, the bankrupt was the owner of what was known as Queen's traveling circus and menagerie, which he had for several years prior thereto been engaged in exhibiting about the country. The defendant, a printing company of Buffalo, New York, had been accustomed to do his printing, for which he was usually considerably in debt to them, paying on a running account as was found convenient. In October, 1877, this indebtedness amounted to abou $18,000, but up to that time the defendant had no reason to believe

him insolvent, and had not pressed him for payment. Shortly after, October 16, 1877, McCune, the president of the company, received from Queen a letter of that date from Hillsboro, Illinois, stating that he had been compelled to give to E. D. Calvin, his superintendent, and others of his leading employes, a chattel mortgage on his circus property for $13,000; that he hoped McCune would not join them in legal proceedings, and assuring him that he would be paid. This mortgage was executed at Shelbyville, Illinois, on October 15, 1877, and was given to secure six promissory notes to Calvin and his associates, amounting together to $13,045.71, payable in 60 days. The mortgage was recorded in Shelby county, Illinois, October 15th, and at St. Louis October 23d. The letter to McCune did not have the effect intended, as McCune immediately went west, whither the circus was traveling, and arrived at St. Louis about the same time with the circus, shortly after the twentieth of October. In Queen's absence McCune immediately caused suit to be brought against him by the present defendant in St. Louis, and all the circus property to be attached by the sheriff.

Shortly thereafter he learned that on the ninth of October Queen had executed at Indianapolis, Indiana, a bill of sale of all the circus and menagerie property to James How, of Brooklyn, New York, and that How had given back an agreement of the same date to resell the same property to Queen upon payment of six notes, amounting together to $35,000. The evidence showed that this transaction was designed as security for an old debt of $25,000, and for $10,000 additional, which Queen hoped to get from How to supply his present needs, but which How afterwards declined to furnish. The agreement of resale provided that Queen was to maintain and exhibit the show as before, which he accordingly did. This transaction, I hold, had the effect only of an unrecorded mortgage.

By assignment, dated October 17, 1877, How assigned all his claim to Robert C. Deniger, of New York, who seems to have held somewhat confidential relations with both How and Queen, and Deniger was now in St. Louis. The season for exhibitions was at its close; it was necessary to provide winter quarters for the animals, and some $3,300 was owing for wages to the minor employes of the circus. To pay these wages, and to remove and provide for the menagerie over winter, about $10,000 was required.

Under these circumstances, Deniger claiming to be the owner of the property by virtue of the bill of sale to How, and Calvin and the defendant claiming liens by the subsequent mortgage and attach-

ment, an agreement was entered into, dated October 24, 1878, whereby the defendant agreed to release his attachment, and Deniger agreed to take and provide for the show property, and to sell the same, and pay 50 per cent. of the defendant's claim within 90 days, or else after that time reorganize the show and pay defendant the same amount in cash or good bankable paper, and as security for such agreement he transferred the property to the defendant.

After further communication with How, Deniger informed defendant of his inability to carry out this contract, and thereupon a new arrangement was made October 27, 1878, when the various transfers were executed under which the defendant claims, and which the plaintiff now seeks to set aside. By this arrangement Calvin and his associates transferred to the defendant all their interest under the chattel mortgage, and surrendered to it the six notes of Queen which were secured by it. Deniger and Queen executed to the defendant a bill of sale of all the circus and menagerie property, and a tripartite agreement was entered into between Deniger, Calvin, and his associates and the defendant whereby the defendant was to pay the wages owing to the employes, remove the property to Louisville for winter quarters, pay all the expenses of removing and keeping the property over winter, and permit Deniger to repurchase the property within 90 days, upon repayment of defendant's advances for these purposes, and 50 per cent. upon its claim against Queen, and upon payment to Calvin and his associates of $7,550, and interest upon their claims; and in default thereof the defendant was to sell the property, and from its proceeds repay such advances and 50 per cent. of its own claims against Queen, $7,550 of the claims of Calvin and his associates next, and the balance, if any, to Deniger.

Under this transfer and agreement the defendant paid the wages of the employes of the circus, amounting to $3,309.95, removed the menagerie to Louisville, as agreed, and there maintained it, at an expense of $6,107.39, until in default of repurchase by Deniger, as provided by the agreement, it sold the property on February 25, 1878, for about $20,000, from which, after deducting its advances, it realized 50 per cent. upon its own claims against Queen, and accounted for the balance, a few hundred dollars only, to Calvin and his associates, according to agreement. So far as this agreement provided for the advances of money for the preservation of the property, no objection was made to it. But the plaintiff claims that this transaction was void as against the assignee in bankruptcy, under section 5128 of the Revised Statutes, as involving an unlawful preference of the defend-

ant. It is not claimed to come under section 5129, which relates to transfers other than those of giving preferences to creditors. *Gibson* v. *Warden*, 14 Wall. 244.

The defendant was a creditor seeking to recover something upon its demand. The arrangement made was out of the usual course of business, as it transferred all the circus property; it contemplated, at least, a contingent preference of the defendant for a part of his claim, and such has been its result. The debtor, Queen, assented to it, not, as he testifies, with any wish or intent to give any preference to the defendant, but obviously on account of its relief from present embarrassment, and to retain through Deniger his claims of going on with the business in the spring, upon Deniger's expected repurchase of the property. This purpose, if no one were legally injured by the means adopted, was justifiable. *Tiffany* v. *Lucas*, 15 Wall. 410. But, though this was doubtless Queen's main motive, he is none the less legally chargeable with having intended all the contingencies for which the agreement provided, and among these was a preference to a greater or less extent of the defendant. Queen was insolvent at that time, and from the circumstances above stated I cannot doubt that the defendant, and all the other persons taking part in the arrangement then made, knew, or had reasonable cause to believe, him so. If, in addition to this, the evidence warrants the conclusion that the defendant also *knew* that the transfer was a fraud upon the bankrupt act, then all the conditions of section 5128 exist, and the plaintiff must recover. And this is the only substantial question in the case.

Knowledge that a transfer is a fraud upon the act must include actual or constructive knowledge that the transfer is either expressly forbidden by the act or inconsistent with its policy and intent. If the transaction as a whole is not one which, under the circumstances known to the grantee, or ascertainable by him with ordinary care, would be condemned by the words or the policy of the act, then no fraud upon it can be said to be "known" to him. It is plain, moreover, that neither the words nor policy nor intent of the bankrupt act forbid any settlement by a debtor with his creditors, nor any disposition of his property, to which *all* his creditors assent. *In re Miller,* 1 B. R. 410. In providing for the disposition of the bankrupt's estate through trustees, to be chosen by the creditors and subject to the direction of a committee appointed by them, the bankrupt act itself (section 5103) recognizes the controlling power and interest of even less than the entire body of creditors. An omission of a creditor's name from the schedule of creditors, if made with the creditor's

assent, has been held not to be a "wilful or fraudulent" omission. *In re Needham,* 2 B. R. 387. A transfer is not, then, a fraud upon the act if made with the consent of all persons in interest fairly obtained, however unequal in its results the transfer may prove. Such a consent is a virtual waiver of all the benefits of the bankrupt act, and, when acted on by the transferee, is an estoppel against subsequent incompatible claims under the act. *In re Williams,* 14 B. R. 132, 136; *Johnson* v. *Rogers,* 15 B. R. 1; *In re Langley,* 1 B. R. 559, 565; *In re Schuyler,* 2 B. R. 549; *In re Kraft,* 3 FED. REP. 892. For the same reason a grantee cannot be held to "know" a transfer to be a fraud upon the act if it is assented to by all the creditors known to him, or that upon reasonable inquiry he might and would have ascertained or have had reason to suspect.

Such, upon the testimony, appears to be this case.

The evidence shows that at the time this arrangement was made by the defendant no other creditors of Queen were known to or suspected by McCune, save those who took part in and were provided for by the agreement. The defendant, before taking a transfer such as this, was doubtless bound to make reasonable inquiry as to other creditors. But it appears that McCune had been accustomed from time to time to make such inquiries, and that, only a few months before, Queen, in answer to McCune's inquiries, had assured him that "all he owed in the world besides Mr. How were these circus employes and Mr. Calvin and Mr. Cole. All of these debts were provided for in the arrangement of October 27th, and all of these parties, or their representatives, agreed to it, and warranted a full and absolute title in the defendant. Instead of there being any collusion, the parties were all hostile to each other, and the final agreement was apparently a fair settlement and compromise of the conflicting interests of the largest creditors, while it provided meritoriously for the payment in full of all others known, being the wages and small debts owed by the circus business. All of these debts the defendant seems to have paid—73 in number—and varying in amount from $3 to $369 each. Only eight of them, however, exceeded $50 each, and all the rest would apparently have been entitled to a preference under section 5101. No charge is made that the arrangement was not brought about perfectly fairly as between the parties to it, nor that it has not been executed by the defendant in good faith as among themselves, and it seems to have been intended to provide for all the circus debts; nor does it now appear that there were any other debts belonging to that business.

In *Metcalf* v. *Officer*, 2 FED. REP. 640, 643, it is said that the principal circumstance proving defendant's *knowledge* that a fraud on the act was intended was that "he *knew* that there were other creditors who would be deprived of their right to an equal distribution of the proceeds of the bankrupt's estate."    I am satisfied that the defendant, in entering into the arrangement complained of, had no knowledge or suspicion, and is not legally chargeable with knowledge, of any other creditors of Queen, (if any there are,) except those who took part in and bound themselves by it, and those whose claims were paid in the performance of it; that consequently no known fraud upon the act can be ascribed to the defendant, and that the transfer is therefore not void under section 5128, as claimed.    *Guernsey* v. *Miller*, 80 N. Y. 181.    If this case were to turn upon the simple fact of there being other creditors of Queen, instead of upon the defendant's actual or constructive knowledge of it, I should still hesitate, upon the evidence in this case, to give judgment in favor of the plaintiff.    The proofs were all taken out of court, and the only evidence I have found as to the existence of any other creditors is inferential merely from the following testimony of Queen, a witness for the plaintiff, who says: "I think I was indebted $160,000 or $170,000 when I gave the mortgage and bill of sale.    My bankruptcy schedules will tell."    These schedules were not offered in evidence, while such of the proceedings in bankruptcy as the plaintiff's counsel chose to put in evidence show but one creditor, viz., Deniger himself, who alone proved his debt, and chose the assignee, whose name appears also as counsel upon the written agreement of October 9th between How and Queen; and although other creditors not parties to the agreement, if there were any such, might doubtless have come in subsequently and proved their claims, yet none have done so, so far as the evidence shows, though more than three years have elapsed since the proceedings in bankruptcy were commenced.

The action appears, therefore, to be practically for the benefit of Deniger, who by his agreement and its covenants would be precluded from questioning directly the transaction complained of.    *In re Williams*, 14 B. R. 132, 136, and cases cited.

The statement to Mr. McCune that the circus debts specified, and those to How, Calvin, and Cole, were "all that he owed in the world," was not denied by Queen; and if the existence of other creditors were a material and controlling fact, despite McCune's want of knowledge of it, the mere loose testimony of Queen that he thinks his debts were $160,000 or $170,000, qualified by a reference to his schedules, which

were not produced, while no such outside creditors in fact appear, would be, I think, wholly insufficient evidence upon which to found a decree.

The bill is therefore dismissed.