A. B. SHUETZ, Trustee in Bankruptcy of Alvin Ogburn, Bankrupt v. WALTER BOYT SADDLERY COMPANY, Appellant, and A. B. SHUETZ, Trustee in Bankruptcy of Alvin Ogburn, Bankrupt, v. MOLINE PLOW COMPANY, Appellant.

**Bankruptcy:** RECOVERY OF PREFERENCES. In the action by a trustee
1  in bankruptcy to recover preferential payments made in an attempt to compromise and settle with creditors, the evidence is held to show that the guardian of an incompetent surety on the insolvent's notes did not consent to the attempted settlement prior to bankruptcy proceedings, by which a class of creditors received the proceeds of certain insurance policies pro rata, and the holders of the notes were to receive the proceeds of the other assets of the bankrupt.

**Same:** INSOLVENCY: EVIDENCE. The evidence is also held to show
2  that the bankrupt was insolvent at the time of the pretended settlement.

**Same:** VOIDABLE PREFERENCES: EVIDENCE. Where certain creditors
3   of a bankrupt had notice that it was proposed to distribute
a certain fund among them, ignoring other creditors, and that
the proceeds from another source which it was proposed to dis-
tribute among another class of creditors would not give such cred-
itors the same pro rata share of the bankrupt's estate, they had
reasonable cause to believe that a preference was intended to be
given within the bankruptcy law.

**Same:** RECOVERY OF PREFERENCES BY TRUSTEE. Where the attorney
4   for an insolvent collected and had in his hands funds belonging to
his client, and in arranging a settlement with creditors acted for
the insolvent and not as trustee for the creditors, preferential
payments made from the funds were recoverable by the trustee
for the insolvent in bankruptcy proceedings, although the funds
were collected by the attorney more than four months prior to
the petition in bankruptcy.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN,
Judge.

WEDNESDAY, JUNE 24, 1914.

THE two cases were tried together in the district court,
but separate decrees entered, the relief prayed being granted
plaintiff in the case against the Walter Boyt Saddlery Com-
pany and also in that against the Moline Plow Company. The
defendants in each case appealed.—*Affirmed.*

*Miller & Wallingford, Charles F. Maxwell,* and *Geo. Wam-
bach,* for appellants.

*Clifford V. Cox* and *R. B. Alberson,* for appellee.

LADD, C. J.—Alvin Ogburn was engaged in the implement
and harness business at East Peru. The stock of goods with
building burned in the last of October, 1910. A petition of
1. BANKRUPTCY:    voluntary bankruptcy was filed with the clerk
recovery of      of the United States District Court, July 19,
preferences:
evidence.        1911, and on October 5th following he was
adjudged a bankrupt. Unsecured claims, amounting to

$5,473.34, have been filed with the referee in bankruptcy, and not to exceed $500 has been realized from the assets of the bankrupt. These actions were begun August 29, 1912, and are based on section 60 of the Bankruptcy Act of Congress, approved July 1, 1898, as amended, declaring that:

A person shall be deemed to have given a preference if, being insolvent, he has, . . . made a transfer of any of his property, and the effect of the . . . transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. If a bankrupt shall have given a preference within four months . . . and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee and he may recover the property or its value from such person.

It appears from the evidence that shortly after the fire, Ogburn employed J. D. Wallingford of the firm of Hewitt, Miller & Wallingford of Des Moines to collect the indemnity stipulated by the several insurance companies whose policies covered the property destroyed, and that he received $3,158.88 in February, 1911, and $1,841.12 March 8th following. On March 3, 1911, the bankrupt with two brothers, Walter and John Boyt, representing the Walter Boyt Saddlery Company, N. B. Sprowl, representing the International Harvester Company, and John Allen, guardian of Wm. Ogburn, then incompetent, and Wallingford, met at the office of Hewitt, Miller & Wallingford in Des Moines, and it was there proposed that the insurance money, less attorney's fee and items of expense amounting to $225.42, be distributed pro rata to the mercantile creditors in full payment of their claims, and that creditors to whom debts were owing for money borrowed by Alvin Ogburn take the other assets belonging to him, then at East Peru, and his expectant interest in his father's estate, and this plan appears to have been agreed upon by all except Allen. He had been appointed temporary guardian of Wm.

Ogburn shortly before, and it appears that Wm. had signed promissory notes with his son, Alvin Ogburn, as follows: A promissory note of $1,900, payable to Deardorf, one of $500, payable to Mrs. Wright, one of $200, payable to Harwood, another of $1,500, payable to Smith, and still another of $800, payable to Hammond. None of these notes had been paid at that time though the ward of Allen was surety thereon. None of these payees were advised that any such proposition was being made. Allen declared that he was not in a position to consent thereto, but agreed to examine the assets and send word to Wallingford of his conclusion. He and Alvin Ogburn inspected these the following day. Allen testified that he estimated their value at between $900 and $1,000, and that he subsequently sent word by Ogburn to Wallingford that he would not accept the proposition. This testimony is not controverted save by that of Sprowl, who testified to conversations with Allen wherein Sprowl remarked, "The creditors have probably saved the expense of litigation and that it was a good settlement;" to which Allen replied, "Yes, sir; it is probably the best settlement that could have been made." This was some time after the insurance money had been distributed by Wallingford to the mercantile creditors. Wallingford testified that Alvin Ogburn reported to him about a week after the conference that Allen was satisfied with the proposition, and that Ogburn then directed him to submit the proposition in writing to all the mercantile creditors, which he did March 16, 1911, by addressing a letter to each, including the defendants, in words following:

Mr. Alvin Ogburn, of Peru, Iowa, suffered a fire loss on October 30, 1910, leaving him possessed of fire insurance policies amounting to $5,500.00, and accounts and personalty of the supposed value of $2,500.00. The face of the claims due his merchandise creditors amount to $7,216.85. New claims of which we have no record may increase this total somewhat. The face of the notes due for borrowed money aggregates $4,900. His approximate total debts therefore is the sum of $12,116.85. The three insurance companies on the risk were

unwilling to settle in full for reasons which they claim were sufficient.   To avoid litigation and with the approval of the insured and the larger creditors a compromise settlement was entered into for $5,000, which has just been fully paid.   Mr. Ogburn employed us to attend to the insurance adjustment and has now asked us to acquaint his creditors with his financial status.   In order to avoid bankruptcy and the attending expenses it is proposed that the insurance money, less a reasonable attorney's fees be apportioned among the merchandise creditors in full of their respective claims and that the proceeds of the other personal property aforesaid amounting to some $2,500.00 in value to be applied on the aforesaid notes aggregating $4,900.   If this proposal be not unanimously accepted, Mr. Ogburn to obtain his release necessarily will have to be adjudicated a bankrupt.   As a business proposition merchandise creditors whose claims aggregate some $3,000 have already agreed to avoid bankruptcy by now participating in the net insurance money in proportion to the face of their respective claims.   Kindly advise us by return mail if you will accept 65 per cent net to you in full face of your claim which is listed with us for $673.44?        Yours truly,

[Signed]     Hewitt, Miller & Wallingford.

On March 28th following, another letter was written, saying that:

Additional and approved claims have come to the surface necessitating a dividend of .6364.   Rather than longer delay a distribution, we are now distributing a fund upon the advice of the majority of the large creditors consulted in order that the listing creditors may receive remittance before any additional ones are discovered.

It was added that, "The face of the claims now listed is $7,502.62."   All but one of the creditors accepted, and it in part and the proceeds collected from the Insurance Company, less the items mentioned, were distributed accordingly to the mercantile creditors, March 29, 1911, $342.50, being remitted to the Walter Boyt Saddlery Company and $428.57 to the Moline Plow Company, and these amounts are sought to be recovered in these actions.

I. Allen was subsequently appointed permanent guardian of Wm. Ogburn, and has paid the promissory notes on which his ward was surety, and we are not inclined to disturb the finding of the trial court that he did not consent to or acquiesce in the proposition that these notes should be satisfied from the assets of the bankrupt at East Peru alone. As temporary guardian, he was without authority so to do—at least without an order of court—and, moreover, he would not be likely to accept when he knew the property would produce a dividend of less than 20 per cent while the mercantile creditors would be obtaining $ .6364 on the dollar.

II. The main controversy is whether there was a preference such as contemplated by the federal statute. To render the transfer of these remittances void, four facts must be established: (1) the insolvency of the bankrupt at the time of the transfer; (2) that the defendants obtain a greater percentage of their indebtedness than other creditors of the same class; (3) that the preference was given within four months before the filing of the petition in bankruptcy; and (4) reasonable cause on the part of defendants to believe that a preference was intended. *In re Dundas* (D. C.), 111 Fed. 500; *In re Leech,* 171 Fed. 622 (96 C. C. A. 424) ; *Tiffany v. Lucas,* 15 Wall. 410 (21 L. Ed. 198) ; *Warren v. Moody,* 122 U. S. 132 (7 Sup. Ct. 1063, 30 L. Ed. 1108).

III. Under the act of Congress, a person is deemed insolvent ''whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed or removed, or permitted to be concealed or removed with intent to defraud, hinder, or delay his creditors shall not at a fair valuation be sufficient in amount to pay his debts.'' The face value of the policies of insurance was but $5,500, and, according to the testimony of Allen, the property of Ogburn remaining at East Peru after the fire did not exceed, on March 4, 1911, $1,000, and Ogburn had no money or accounts. There was no evidence that he had any other property, and the cir-

2. SAME: insolvency: evidence.

cumstance that he proposed to assign his expectancy in his father's estate in payment of his creditors, loaning him money, tends strongly to indicate that he had nothing else. Moreover, the conference on March 3d proceeded on the theory that this was all the property available for the satisfaction of his debts. The schedules in bankruptcy indicate that his indebtedness greatly exceeded his assets and he was adjudged insolvent October 5th following. The evidence discloses that he had not engaged in business in the meantime, and we are of opinion that the circumstances were such as to plainly indicate his insolvency at the time the pro rata share of the insurance money was paid to the defendants.

IV. It appears conclusively that defendants obtained a greater percentage of their indebtedness than did other creditors of the same class, that is, unsecured creditors. The proceeds of assets other than the money collected on the insurance policies amount to not more than $500, and was estimated at not to exceed $1,000 in value by Allen the day after the conference of March 3, 1911. There is no evidence indicating otherwise, and we necessarily conclude that defendants were favored by the payment of a larger dividend on their claims than was available for other unsecured creditors, i. e., those who had loaned the bankrupt money.

V. Not only is this true, but the defendants were so advised in the circular letters sent out by Wallingford. These informed them that the mercantile claims amounted on their

3. SAME: voidable preferences: evidence.

face to $7,502.62, and it was proposed to apply on these pro rata $5,000, less $225, or to pay $ .6364 on the dollar. They also informed them that Ogburn was possessed of "accounts and personalty of the supposed value of $2,500," and that "the face of the notes due for borrowed money aggregate $4,900." If that much were realized, 51 per cent might be paid on these last debts. The purpose is then clearly expressed in saying:

In order to avoid bankruptcy and the attending expense, it is proposed that the insurance money, less a reasonable

attorney's fee, be apportioned among the merchandise creditors in full of their respective claims, and that the proceeds of the other personal property, aforesaid, amounting to some $2,500.00 in value, be applied on the aforesaid notes, aggregating $4,900.00.

This in the clearest fashion advised the recipients of these letters that a preference was intended.

VI. The petition in bankruptcy was filed within four months after the insurance money was distributed to the mercantile creditors, and the defendant contends that title thereto

4. SAME : recovery of preferences by trustee.

had previously passed to Wallingford, as trustee for the creditors. There is no controversy but that he was first employed as an attorney to collect the insurance indemnity in the latter part of November, 1910, and if Ogburn is to be believed, he was in his employment and held the money for him until it was distributed. Undoubtedly Ogburn intended to devote all his property to the payment of his debts, and for that purpose left the insurance money in the hands of Wallingford. He testified:

The money was paid to J. D. Wallingford, by the insurance companies as my attorney and agent for the collection and distribution of said money among the mercantile creditors pro rata who would accept in full for their claims. . . . Mr. Wallingford represented me throughout the entire transaction until this money was distributed to my mercantile creditors. . . . I had no arrangement for the distribution of the money unless the mercantile creditors would receipt in full.

He testified, further, that Wallingford represented him at the meeting of the creditors March 3d, and that he never authorized Wallingford to "distribute the insurance money except upon the condition that the mercantile creditors would agree to accept their pro rata share of such insurance money in full payment of their claims." Mr. Wallingford testified that Ogburn instructed him that he desired the insurance money to be applied in settlement of his mercantile indebted-

ness, and to communicate with the creditors and see what arrangement could be consummated, that the creditors might obtain a larger payment than in any other way, and that Ogburn and the creditors present at the meeting of March 3d, instructed him to submit the proposition formulated in the letter of March 16th, and that if the creditors did not accept the proposition, he was to notify Ogburn and he was to come to the office for the purpose of acquainting the creditors with the situation, and for the purpose of being either put in bankruptcy or filing a petition. He testified, further, that it was understood that if the money was not paid to the creditors, it was to be held by him to be delivered to the trustee in bankruptcy when appointed, and that this arrangement was made by Ogburn. The evidence leaves no doubt but that it was his persistent purpose to devote his entire property to the satisfaction of his indebtedness, and he so declared, in the presence of the representatives of his creditors, and instructed Wallingford to retain the money for this purpose. There is nothing to indicate, however, any purpose on his part to pledge the money to the creditors or to leave the money with Wallingford as a pledge, or to divest himself of the title thereto for the benefit of the creditors prior to distribution. Wallingford, in his testimony, does not claim to have ceased acting as his attorney, and Ogburn testified that he represented him throughout the entire transaction until the insurance money had been distributed. The proposition to the mercantile creditors was that the money was to be distributed upon all accepting the payment of the dividend in full satisfaction of their debts. Suppose they did decline, to whom would this money have belonged, or suppose any of them had undertaken to enforce this alleged trust in their behalf, could this have been done prior to the acceptance of his proposition? Certainly not. Nor would there have been an agreement until the proposition actually had been accepted. Had the proposition been rejected, the money would have been his, and this was recognized by the understanding that in that event bankruptcy

proceedings should be begun and the money turned over to the trustee. The case is so manifestly one where the debtor is undertaking to adjust his obligations with his creditors, that it is unnecessary to revert to the definitions of a trust. The attorney was acting under the debtor's directions in making the propositions to the creditors, and in directing the distribution of his assets, and there is no ground for inferring that he was acting as trustee for the creditors. The four facts essential to render the payments to defendant void as against other creditors of like class were fully proven, and the judgments are—*Affirmed.* All the Judges concur.