STONE v. JENISON.

1. BANKS AND BANKING—INSOLVENCY—PREFERENCES.

3 How. Stat. § 3208e6, declaring void all payments of money made by a bank, either after the commission of an act of insolvency or in contemplation thereof, with a view to prevent the application of its assets in the manner prescribed by law, or with a view to the preference of one creditor over another, does not invalidate a payment to a depositor, although made after an act of insolvency, unless the unlawful view or intent was also present.

2. SAME—PAYMENT DURING RUN—INTENT—EVIDENCE.

Payments to a depositor during a run on a bank, and after the cashier has persuaded some persons not to withdraw their deposits, but when the bank has assets sufficient so that its officers hope and expect to continue business and be able to pay all the debts of the bank, are not made with a view to prevent the application of the assets of the bank in the manner prescribed by statute, or with a view to the preference of that depositor over other creditors, within the meaning of 3 How. Stat. § 3208e6.[1]

---

[1] With this case as reported in 36 L. R. A. 675, is a note on the payment of a depositor during a run on a bank as an unlawful preference.

Error to Ingham; Person, J. Submitted November 19, 1896. Decided February 18, 1897.

*Assumpsit* by George W. Stone, receiver of the Central Michigan Savings Bank, against Nelson F. Jenison, to recover the amount of certain certificates of deposit alleged to have been paid to defendant after the bank became insolvent, with a view to his preference over other creditors of the bank. From a judgment for defendant, plaintiff brings error. Affirmed.

*M. V. & R. A. Montgomery*, for appellant.

*Kilbourne & Harris* and *Smith & Lee*, for appellee.

MOORE, J. The plaintiff sued the defendant to recover from him the amount of deposits paid to him by the Central Michigan Savings Bank on the forenoon of the day in the afternoon of which the bank closed its doors for want of funds to carry on its business. The defendant had judgment in the court below. The plaintiff brings error.

The facts, so far as it is necessary to state them, are as follows: The Central Michigan Savings Bank was incorporated in 1875, under the general banking act, and conducted a savings and a commercial department, until it suspended, April 18, 1893, when plaintiff was appointed as receiver. During all the time the bank was doing business Mr. Bradley was its cashier, and had general management and control of its affairs. When the bank suspended, its assets were nominally $860,000, and its liabilities, exclusive of capital and surplus, were about $700,000. After the bank closed, and its affairs passed into the hands of a receiver, it was found that a large amount of the paper held by it was of doubtful value, because the makers of the paper had become financially embarrassed during the year prior to the suspension of the bank; and it is now evident that the depositors will not be

paid in full. The defendant made his last deposit in the bank February 27, 1893. The day the bank suspended, the defendant had six certificates of deposit, four of which he had held more than three months. Those were paid to him, principal and interest. The deposits represented by the fifth and sixth certificates had not been in the bank three months, and no interest was paid on them. It is claimed by the plaintiff that the bank was insolvent, and known to be so by the cashier, and that it had also committed two acts, at least, of insolvency. In relation to the last proposition, the proofs show that the bank owed the state treasurer $25,000; that, two or three days before the suspension, the deputy state treasurer called at the bank, and asked for the money. The bank had funds enough to pay him, but he was told by Mr. Bradley that he would much rather he would not draw the money then, on account of the closeness of the money market, and he went away without it, though he was afterwards paid. The proof with reference to the other act of alleged insolvency is that, some weeks before the bank closed, Herbert Johnson left at the bank, with Mr. Bradley, a $10,000 mortgage belonging to his father, together with a discharge, to be delivered when the money should be paid by the maker; that two or three days before the suspension he called at the bank, and inquired if the money had been paid, and was told by Mr. Bradley that it had not; that on the morning of April 18th, after the bank opened, he called at the bank, and asked again if the mortgage had been paid, and Mr. Bradley replied that it had not; that shortly afterwards he learned that the mortgage had been paid to Mr. Bradley a week or ten days before, whereupon he demanded the money, together with $1,600 due his father on open account, and for which he had a check; that Mr. Bradley tried to induce him to take some securities; that, after waiting some time, Mr. Bement came in, and paid Mr. Bradley $5,000, which

money Mr. Bradley gave Johnson, together with a draft on the Third National Bank of Detroit for the entire balance; that he took such draft, and went to Detroit, immediately presented the same, and payment was refused,—for what reason the record does not disclose, though it discloses that the draft was drawn against a fund that the bank had in Detroit. The bank closed on Tuesday. On Saturday and Monday preceding, some deposits were made in the bank, and there was a slight run on it. On Tuesday morning there was a run on the bank, and in the effort to stop the run about $108,000 was paid out. Included in this was the amount paid Mr. Jenison. The run then became so great that it was evident the bank must suspend, and its doors were closed at about 3 o'clock, with funds amounting to about $10,000 still in the bank. Mr. Bradley's testimony is that there was no thought of preferring Mr. Jenison when the payment was made to him, that they were paying all certificates of deposit as they were presented, and that he hoped and expected the bank would be able to continue business, and that he then believed that the bank had sufficient assets to pay all of its depositors in full. He also testified that what was done in reference to the deposit of the state treasurer and the Johnson collection, as well as the payment of all the deposits, was done to protect the bank, and to enable it to continue to do business, and was not done expecting the bank would discontinue business, or for the purpose of preferring one creditor over the others.

The plaintiff asked the circuit judge to instruct the jury as follows:

"If, when the defendant received his money, the bank was insolvent, and if the defendant demanded to be preferred, and if Mr. Bradley so understood him, and, so understanding, caused the money to be paid to him, and if the defendant was, as matter of fact, preferred by such payment, then the law presumes that what was done was intended; and, if the payment to Jenison was not made

with a view to his preference, the burden of proving such fact rests upon the defendant.

"The refusal by Mr. Bradley to pay over the money to Mr. Johnson on the morning of the 18th was an act of insolvency of the bank. Mr. Bradley is conclusively presumed to have known that it was an act of insolvency, and thereafter, for the few hours the bank remained open, he had no right to pay money to other depositors with a view to their preference. And from Mr. Bradley's refusal to pay Mr. Johnson in the morning, and that he did pay Mr. Jenison a short time thereafter, the jury may presume he did intend to prefer the defendant.

"If the real situation of the bank, as it actually was, considering the actual condition of affairs, made it reasonably certain that the bank must suspend, then Mr. Bradly must be held to have known it; and the mere fact, if it be a fact, that he (Bradley) did not expect to suspend, or did not believe he would be obliged to suspend, is of no consequence.

"If the actual condition of the bank at the time the money was paid to the defendant rendered it morally certain that it must soon suspend, and if such prospect was apparent to any intelligent person, then the mere fact, if it be a fact, that Mr. Bradley did not so believe, is unimportant.

"If, when the money was paid to the defendant, Mr. Bradley knew and understood that the bank was in a precarious situation, and that suspension was not only probable, but imminent, then such payment was unlawful.

"The mere fact, if it be a fact, that Mr. Bradley believed or expected, or that he now thinks that he then believed or expected, that the bank would not be obliged to suspend, is of no consequence, if, as matter of fact, there was then no reasonable ground for such belief or expectation."

The court declined to give these requests, and, as appears from the record,—

"The court thereupon instructed the jury that there was no evidence that any act of insolvency had been committed when payment was made to Mr. Jenison; to which instruction plaintiff's counsel then and there excepted. The court further instructed the jury that plaintiff was not entitled to recover unless the jury were satisfied from

the evidence that, when the money was paid to defendant, Mr. Bradley expected the bank's suspension, or thought he probably must suspend; to which instruction the plaintiff's counsel then and there excepted. The court further instructed the jury that, if they were satisfied from the evidence that Mr. Bradley did not expect to suspend when the money was paid to the defendant, but thought the probabilities were he should get through, that plaintiff could not recover; to which instruction plaintiff's counsel then and there excepted."

This case involves the construction of 3 How. Stat. § 3208e6, which reads as follows:

"* * * All payments of money, either after the commission of an act of insolvency or in contemplation thereof, with a view to prevent application of its assets in the manner prescribed in this act, or with a view to the preference of one creditor over another, shall be held to be null and void."

It is the contention of the plaintiff, stated in the language of his eminent counsel:

"*First.* That no payment should have been made, nor withdrawal permitted, after the trouble began.

"*Second.* That, the bank being insolvent, every such payment (even had there been no run) was unlawful.

"*Third.* There were at least two 'acts of insolvency' committed prior to the payment to defendant. He was paid; the bank suspended; he was preferred. If paid, and if suspension followed, such payment was, of necessity, a preference, and therefore the case is made out."

Unfortunately, there has been no construction given to the section of the statute, under which this action is brought, by our court. The question at issue must be determined by the rulings of other courts in relation to similar statutes. A reading of the statute, giving its words their natural meaning, would indicate that two things must concur to make the payment void: Not only must there be an act of insolvency, or a contemplation of insolvency, but the payment must be made with a view to prevent the application of the assets of the bank in the

manner provided by the act, or the payment must be made with a view to the preference of one creditor over another. Can it be the law that when a bank, having assets sufficient so that its officers believe, if it can continue in business, it will be able to pay all its debts, is confronted with a run on the bank, and, to avoid the necessity of suspension, pays its depositors as fast as they present their certificates of deposit,—that under such circumstances, if the bank is compelled to suspend, the receiver can sue, and recover the money paid in good faith to the depositors? In the case of *Hayes* v. *Beardsley*, 136 N. Y. 299, which was a case of payment of certificates of deposit after the bank became insolvent, and after the cashier had known for months that it was insolvent, this language is used:

"There was no satisfactory evidence that these payments were made by the bank to prevent the application of its assets in the manner prescribed in the national banking act, or with a view to a preference of the defendant over the other creditors of the bank. * * * There does not appear from the facts found to be any better ground for claiming that these payments made to the defendant were void than there is for making the same claim in reference to the numerous payments made in the regular course of business by this bank to its customers during many months prior to the closing of its doors. In order to uphold a recovery in an action like this, there should be some satisfactory evidence that the cashier or other officer actually paid the money of the bank in contemplation of insolvency, for the purpose of giving a preference to the payee, and with a view to prevent the application of the assets of the bank to the creditors generally."

The provisions of the act construed in this decision are almost identical with the provisions of the Michigan banking act, and we think the construction a reasonable one. If the receiver can maintain this proceeding, I can see no good reason why he may not sue and recover from each of the depositors who drew their money after the bank became embarrassed. Such a construction does not commend itself to one's sense of justice. See *Curtis* v.

*Leavitt*, 15 N. Y. 198; *Fidgeon* v. *Sharpe*, 5 Taunt. 545; *Tiffany* v. *Lucas*, 15 Wall. 410; *Jones* v. *Howland*, 8 Metc. (Mass.) 377 (41 Am. Dec. 525); *Utley* v. *Smith*, 24 Conn. 310 (63 Am. Dec. 163); *Haas* v. *Whittier*, 97 Cal. 411. The circuit judge was not very fortunate in the language used by him in his charge to the jury. We do not regard his charge as a good statement of the law. However, in view of the decisions already cited, we do not see how, under the record as made, the plaintiff can maintain his action. There is nothing in the record from which the jury would have been warranted in finding that the payment to the defendant was made with a view to prevent the application of the assets of the bank in the manner prescribed in the banking act, or with a view to the preference of the defendant over the other creditors. Taking this view of the case, we affirm the judgment.

GRANT, J. I concur in the conclusion reached by my Brother MOORE. I do not, however, concur with him in his criticism of the charge of the court. I think the court should have directed a verdict for the defendant. There was no evidence to show either an act of insolvency or a payment in contemplation of insolvency on the part of the cashier of the bank, with a view to prefer the defendant, or any other depositor who presented his check or certificate of deposit and demanded payment. The record shows no refusal to pay any depositor who presented a check. Mr. Bradley did no more than to urge certain depositors to withhold their demands. Is it an act of insolvency when a debtor urges his creditor to withhold demand of payment? Mr. Bradley, the cashier, was the plaintiff's witness, and he is bound by his testimony. He swears positively that he intended no preference, and that he thought he would be able to stem the tide, and that he would be able to pay in full, if he succeeded in stopping the run upon the bank. He did not stop paying until it became evident that the money in the bank would be exhausted, and then he closed its doors. He paid Mr.

Johnson $5,000, and gave him a draft for the balance due him on a bank in Detroit, where there were deposits sufficient to meet it.   The defendant's deposits were subject to payment upon demand.   The learned counsel for the plaintiff conceded that, where depositors check out their money in the usual course of business, the receiver cannot recover it back upon the ground that it is a preferred payment. Many solvent banks are unable to withstand a run, and are justified in paying out deposits so long as they honestly believe that they can thus prevent the closing of the bank.   I find nothing in this record to justify the conclusion that defendant did not check out his deposit in the legitimate course of business.   It is not unusual for depositors to check out their entire amount, desiring to use it in their trade or business.   Defendant was a merchant, and, for aught that appears here, may have desired and needed this money to pay his obligations.   It appears from the conceded facts that the receiver will be able to pay depositors 75 per cent. of their claims.   The receiver has had a great deal of litigation, which, of necessity, has been expensive.   With such assets as are shown here, the cashier might honestly have believed that he could stop the run by continued payments.   It is not sufficient that the payment "did operate as a preference."   There must be the actual commission of an act of insolvency, or the payment must be made in contemplation of insolvency, or with the intent to prefer.   I think there is nothing upon this record to bring the case within the statute.   For this reason I think the judgment should be affirmed.

HOOKER, J. (*concurring*).   It seems to be agreed that the right of plaintiff to recover must be based upon the fact that after the bank had committed an act of insolvency, or when in contemplation thereof, the payment sought to be recovered back was made with a view to prevent the application of its assets in the manner prescribed in the banking act, or with a view to the preference of one creditor over another.   We may reasonably say that

the words "with a view to" mean with the intent to or design of pursuing a particular course, and that this intent or design means the intent of the bank or officer making the payment, and not the recipient of the payment. In this case it may be said that there was a run on the bank, after the act of insolvency, and after a condition of things existed showing that the cashier should have known that the bank was in an insolvent condition; and, there being a run on the bank, and the defendant having asked to withdraw his deposits, thereby forfeiting interest upon the certificates, it may be presumed that he knew of the run, and feared that the bank would fail, and therefore took the precaution to withdraw his money. It appeared that, during such run, the cashier persuaded some depositors not to draw out their money at that particular time, while others were paid; and that in one instance, at least, he gave as an excuse the closeness of, the money market. It is said that the effect of this was to prevent the application of the assets of the bank in the manner prescribed by law, and to prefer such creditors as were paid to those who were not; that the cashier necessarily knew it; and that it necessarily follows that the payments made were made with such intent or view, and consequently the payment was recoverable under the statute.

If this reasoning is correct, there is no necessity for saying that the jury should be permitted to *infer* that payments were made with such view. The court should have so stated, and directed them to find such fact. From such a rule it would inevitably follow that the refusal of a payment, or the persuasion of a depositor to forego his right to draw out his funds, after an act of insolvency, or after knowledge by the officer that the bank was insolvent, would invalidate every payment subsequently made, no matter how long a period intervened between such refusal and the closing of the bank doors. New depositors, whose dealings began by a deposit after the refusal, and in ignorance

of it, would be in no better situation than others; and, under the application of this rule, the longer the bank might be able to take deposits the larger the dividends that could subsequently be declared. A man who was turning over a small capital, by depositing daily and drawing in the course of his business, might become liable to the bank for an amount several times as large as the sum that he was actually using in his business, and perhaps more than he was worth. If this is the rule, where is there necessity or opportunity for the application of the doctrine that "payment in the ordinary course of business, though after actual insolvency of the bank, is good, its condition being known to the officers, *but not to the payee?*" See 2 Morse, Banks, § 625; *Dutcher* v. *National Bank*, 59 N. Y. 5; Boone, Banking, § 301. If it be the rule, it would seem to follow that, as soon as a bank has committed an act of insolvency,—*e. g.*, asked a depositor to forego drawing his money out, while others are paid,—or when the officers of the bank have reason to believe that they must, or even may ultimately be compelled to, close the bank and go into liquidation, it is its duty to refuse payment at once. No matter how much faith it may have in its ability to weather the storm, it must know that the validity of subsequent payments to its depositors must depend on the success or failure of the attempt to do so. And it would seem equally true that when a depositor has reason to doubt the solvency of the bank, or knows of the commission of a technical act of insolvency, it is his duty to avoid drawing upon his deposit, no matter what his necessities. As a law-abiding citizen, recognizing the duty of the bank not to pay, he must sit idly by, and see other less conscientious depositors depleting the bank, with the knowledge that, if the bank shall ultimately fail, his dividend is being lessened by every payment. It would put an end to all legitimate attempts by banks to withstand financial storms, and, by obtaining forbearance, maintain payments and credit until securities could be converted

into money, thus avoiding sacrifices which would be
fatal. It is rare that the "quick assets" of a bank
are adequate to pay all of its obligations, especially in
times of financial distress; and the consequences of the
doctrine contended for would be disastrous and far-reach-
ing. I am of the opinion that this statute should be given
no such construction, and that, before it can warrant the
collection from a depositor who has received payment over
the counter in the usual manner (*i. e.*, in the due course
of business), it must at least appear that there was
a specific design to accomplish one of the objects men-
tioned, viz., to favor a particular creditor, or to withdraw
its funds from the control of the law, and that it is not
enough that we shall be able to say that the effect of
the act is to prefer the creditor, or to so withdraw the
amount paid,—facts which are in themselves incidental
and self-evident.

In the case of *Dutcher* v. *National Bank*, 59 N. Y. 9,
which was a case similar to this, it is said:

"How can a payment or sale made in the ordinary
and usual course of business by the company, one which
would have been made had the company been prosperous
and solvent, be said to have been made in contemplation
of insolvency, although the company was at the time in-
solvent, which was known to its officers? The act being
done in the ordinary and usual course of business by the
company, uninfluenced by the state of its pecuniary af-
fairs, it cannot be said to have been done in contemplation
of any particular condition of such affairs."

And in answer to a contention similar to that made
in this case, it is there said:

"Section 9 [1 Rev. Stat. 591] declares invalid all convey-
ances, payments, etc., made by the corporation when
insolvent, or in contemplation of insolvency, with intent
of giving a preference to a particular creditor over other
creditors. This, it will be seen, does not include a pay-
ment in the usual course of business, like the one in
the present action. It was held in *Brouwer* v. *Harbeck*,

9 N. Y. 589, that a payment made by an insolvent corporation, or one made in contemplation of insolvency, where the intention of the corporation was to give a preference to a particular creditor, was void, irrespective of the questions whether the insolvency was open and notorious, and whether the party receiving the payment knew of the insolvency, or this particular motive of the corporation in making the payment. A payment made with a view of giving a preference to a particular creditor is one rarely, if ever, made in the usual course of business. In such a case the creditor will usually be sought out by the debtor, and payment made by an unusual transfer of assets, as in the case of *Robinson* v. *Bank of Attica*, 21 N. Y. 406."

The distinction is illustrated by the case of *Hayes* v. *Beardsley*, 136 N. Y. 299, cited by Mr. Justice Moore, where, as in this case, the depositor (who, by the way, was a director of the bank) held three certificates, which were paid,—two by assignment of paper, and one by payment over the counter. The cashier knew, but concealed, the fact of insolvency. It was held that the complaint was properly dismissed, because the plaintiff failed to show that the payments were made in contemplation of— *i. e.*, with a view to—insolvency, or to prevent the application of the bank assets as prescribed in the act. And in a note to *Elmira Savings Bank* v. *Davis*, 25 L. R. A. 548 (142 N. Y. 590), it is said that an act prohibiting preferences does not forbid transfers of securities for a valuable consideration, under a reasonable expectation of obtaining relief, nor transfers contracted for long prior to insolvency to secure loans being made. See cases there cited. Several other cases to be found cited in the opinion of Mr. Justice Moore recognize this doctrine. See *Haas* v. *Whittier*, 97 Cal. 411.

The case of *Tiffany* v. *Lucas*, 15 Wall. 410, 421, arose upon a sale made within six months of a bankruptcy. Lucas purchased from Darby, in April, 1869, a valuable piece of property in St. Louis, for the con-

sideration of $200,000. On the 12th day of July follow-
ing, Darby was declared a bankrupt, and the suit was
brought to avoid the sale to Lucas, on the ground that it
was in contravention of the 35th section of the bankrupt
act. This section reads as follows:

"If any person, being insolvent, or in contemplation of
insolvency or bankruptcy, within six months before the
filing of the petition by or against him, makes any payment,
sale, assignment, transfer, conveyance, or other disposi-
tion of his property to any person who then has reason-
able cause to believe him to be insolvent, or to be acting in
contemplation of insolvency, and that such payment, sale,
assignment, transfer, or other conveyance is made with a
view to prevent his property coming to his assignee in
bankruptcy, or to prevent the same from being distributed
under this act, or to defeat the object of, or in any
way impair, hinder, or delay the operation and effect
of, or evade any provision of this act, the sale, assign-
ment, transfer, or conveyance shall be void.   *   *   *
And if such sale, assignment, transfer, or conveyance
is not made in the usual and ordinary course of business of
the debtor, the fact shall be *prima facie* evidence of
fraud."

Mr. Justice Davis, in delivering the opinion of the
court, said:

"There would seem to be no difficulty in ascertaining
the meaning of Congress on the subject embraced in,
this section in its application to this case. Clearly, all
sales are not forbidden. It would be absurd to suppose
that Congress intended to set the seal of condemna-.
tion on every transaction of the bankrupt which oc-
curred within six months of bankruptcy, without regard
to its character. A policy leading to such a result
would be an excellent contrivance for paralyzing busi-
ness, and cannot be imputed to Congress without an ex-
press declaration to that effect. The interdiction applies
to sales for a fraudulent object, not to those with an hon-
est purpose. The law does not recognize that every sale
of property by an embarrassed person is necessarily in
fraud of the bankrupt act. If it were so, no one would
know with whom he could safely deal, and, besides, a
person in this condition would have no encouragement to

make proper efforts to extricate himself from difficulty. It is for the interest of the community that every one should continue his business, and avoid, if possible, going into bankruptcy; and yet how could this result be obtained if the privilege were denied a person, who was unable to command ready money to meet his debts as they fell due, of making a fair disposition of his property in order to accomplish this object? It is true, he may fail, notwithstanding all his efforts, in keeping out of bankruptcy, and in that case any sale he has made within six months of that event is subject to examination. If it shall turn out on that examination that it was made in good faith, for the honest purpose of discharging his indebtedness, and in the confident expectation that by so doing he could continue his business, it will be upheld. On the contrary, if he made it to evade the provisions of the bankrupt act, and to withdraw his property from its control, and his vendee either knew, or had reasonable cause to believe, that his intention was of this character, it will be avoided. Two things must concur to bring the sale within the prohibition of the law,—the fraudulent design of the bankrupt, and the knowledge of it on the part of the vendee, or reasonable cause to believe that it existed."

In *Utley* v. *Smith*, 24 Conn. 310 (63 Am. Dec. 163), a statute containing similar provisions was under discussion. It was there said by Mr. Justice Ellsworth that—

"We construe the words of the statute in a more specific sense, to wit, the closing of business by an avowed and deliberate failure. So Judge Story construed the word 'bankrupt,' under the bankrupt law of the United States, in *Arnold* v. *Maynard*, 2 Story, 358. He says it describes one acting in contemplation of actually stopping his business because he is insolvent, and utterly incapable of carrying it on. But, not to enlarge on this point, we pass to the second, which, in our view, is entirely decisive of the case. We mean the words 'in view of insolvency.' What meaning shall we attach to these words? They appear to be very plain and pointed, and we cannot doubt that they are important, and that they fully disclose the object which the legislature had in view in the law. No debtor, actually failing, shall be allowed to convey away his property to make preferences among his creditors. Any such conveyance,

made with a view to insolvency, is contrary to the statute, and is utterly void. This is what these words mean, and they mean no more. Actual insolvency is not enough, for this does not necessarily prove any particular view of the insolvent in an ordinary sale or mortgage. His insolvency may have nothing at all to do with it, and be neither the cause nor the occasion of it. It is but a circumstance to be taken into the account in weighing motives; and, although it may work a kind of preference, yet if this was not intended by the parties, if the *quo animo* was wanting, and the conveyance was *bona fide*, and in the usual course of business, the conveyance is not contrary to the language or spirit of the statute."

This case contains an interesting review of the English cases in this connection, and also the case of *Jones* v. *Howland*, 8 Metc. (Mass.) 377 (41 Am. Dec. 525), which is in harmony with the view there taken.

Upon this understanding of the law, there is, in our opinion, nothing in the evidence from which the judge would have been justified in permitting a jury to conclude that the prohibited view, intent, or design existed. It is as consistent with its absence as presence, and therefore I concur with my Brother MOORE that the judgment should be affirmed.

MONTGOMERY, J. (*dissenting*). Agreeing, as I do, with the conclusions of my Brother MOORE that there was evidence showing an act of insolvency committed prior to the payment made to defendant, and that there was, therefore, error in charging the jury that there was no such testimony in the case, I am not able to follow my brother in saying that this was error without prejudice, as I think there was evidence tending to show that the payment to defendant was made with a view to prevent the application of the bank's assets in the manner prescribed in the banking act, and with a view to the preference of one creditor over another. Admittedly, the payment did operate as a preference. It was shown that the embarrassment of the Barnes interests had, for several

weeks prior to the suspension, created uneasiness and solicitude 'on the part of the bank; that the cashier, Mr. Bradley, had been for some time borrowing money on bank obligations and indorsements of friends; that upwards of $50,000 of such obligations were outstanding when the bank closed its doors, and that some of these drew as high as 7 per cent. interest; that subsequent events have shown that about one-third of its $611,500 of loans, discounts, and overdrafts were questionable, and their collection doubtful; that the cashier was familiar with the condition of the assets of the bank. The cashier also testified:

"*Q*. Are you able to recollect anybody else who called and asked for their money, and was sent away without getting it?

"*A*. Of course, that day there was a great many people in there, and, as I said before, there were some I did turn off in that way; but I don't just remember who.

"*Q*. You meant to put them off?

"*A*. Yes, without giving them their money.

"*Q*. Do you remember, among others, the young Miss Hudson?

"*A*. I think I did. I think I remember her coming and speaking to me."

The question of what the just inferences to be drawn from this testimony are is for the jury. If, in fact, the cashier apprehended and expected a suspension, and still made payments to certain of the depositors, while putting others off and not meeting their demands, it would not be erroneous for the jury to find that such payments were made with a view to prevent the application of the bank's assets in the manner prescribed by the act, and with a view to the preference of one creditor over another; and, while the inference is one to be drawn by the jury, there was testimony from which the existence of all these facts might have been inferred. It is unnecessary for us to consider what conclusion we would reach upon the testimony, if presented to us as a guide in determining

a question of fact. *Roberts* v. *Hill*, 24 Fed. 571; *Case* v. *Citizens' Bank,* 2 Woods, 23.

The judgment should be reversed, and a new trial ordered.

LONG, C. J., concurred with MONTGOMERY, J.