### CITY AUTO STAMPING CO v STATE ex FULTON

Ohio Appeals, 6th Dist, Lucas Co

Nos 2675 & 2676. Decided Sept 1, 1932

Boyd and Brooks, Toledo, and Smith, Baker, Effler and Eastman, Toledo, for plaintiff in error.

Gilbert Bettman, Attorney General, Columbus, and Brown and Sanger, Toledo, for defendant in error.

FARR, J.

The Security Home & Trust Company was organized and began a banking business in the City of Toledo about the time stated.

During the early part of 1931, the bank lost substantial amounts as a result of the merger as stated, and were compelled to borrow in February of that year, approximately three million five hundred thousand dollars. The condition of this bank improved up until some time in April, when the borrowed money was reduced to less than two million dollars.

During the month of May and early part of June the bank suffered further withdrawals and loss of deposits and was obliged to further liquidate its securities and to increase its borrowings.

Something like a week before June 16th The Security Home & Trust Company, by its president and other officers, made overtures to the president of The Toledo Trust Company, a bank organized and doing business in the city of Toledo, with a view, if possible, of securing a merger between the two banks and thereby making available to the Security Home & Trust Company sufficient cash to meet the demands upon it. These negotiations resulted in securing the firm of Ernst & Ernst, Accountants, by the Security Home & Trust Company to make an accounting of the financial condition of the company.

On June 15th the president of The Security Home & Trust Company approached the president of The Toledo Trust Company again, upon the proposition of a merger. The president of The Toledo Trust Company declined to commit himself upon the proposition and suggested that inasmuch as the Superintendent of Banks would be required to approve any plan of merger that they might make, it would be best to ask the Superintendent to come to Toledo.

This was done and on that evening Mr. Fulton, Superintendent of Banks, came to Toledo. He had a conversation with both McNary, the president of the Security Home Trust Company and Thompson, president of the Toledo Trust Company.

After having such conversation with these two presidents, Mr. Fulton telephoned an official of the Security Home Trust Company, telling him to call a meeting of the Board of Directors of that corporation on the next morning at 8:30. This was done and the most of the directors attended that meeting. The meeting was called, perhaps, by Mr. Fulton, for the purpose of talking over with the Board of Directors the financial condition of their banking institution, and also to have the Board of Directors give him authority to make an effort to secure assistance for the Bank, either by merger with other banks or through the Clearance House of the city, and also authority in his endeavors to make disclosure of the condition of the Security Home Trust Company.

The Board of Directors authorized the executive committee which was composed of seven members of the officials and directors of the Bank to give Mr. Fulton authority in the premises. The Executive Committee, by the appointment of a committee of three, composed of the president and two other members of the board sought to aid Mr. Fulton in his efforts to secure assistance.

The committee approached Thompson in regard to the merger and after considering the matter some time he announced before the middle of the day, that he had decided to go no further with the merger. Mr. Fulton and the committee made overtures to other banking institutions, but they failed.

Later in the afternoon, they took up the proposition with the Clearing House of the city, endeavoring to get assistance for the Security Home Trust Company that would enable it to "tide over" until some permanent arrangements could be made. This interview continued until probably 5:30 in the evening, when Mr. Fulton failed to secure any assistance for the bank, and as stated, the Board of Directors that evening decided to close the bank.

For some days prior to the 16th of June, there had been heavy withdrawals from the Bank and on that day there was what is commonly denominated "a run on the bank," which resulted in a total loss of deposits amounting to one million six hundred and seventy-five thousand dollars. Approximately one million dollars had been paid out in cash at the paying teller's windows.

Amos Lint was president of both of the companies represented by the plaintiff in error, and Raleigh D. Mills was treasurer of these companies.

Lint was a member of the Board of Directors of The Security Home Trust Company and Mills was a member of The Board of Directors, Vice-President and member of the Executive Committee of seven and also held an executive position in the active business of The Security Home Trust Company.

On the 15th of June, Lint gave Mills a

check for $50,000 on the account of The City Machine & Tool Company, deposited in The Security Home & Trust Company and also a check for a like amount on the deposits of The City Auto Stamping Company in this Bank.

Sometime, probably between twelve and one o'clock on the 16th, Mills withdrew from the deposits above referred to, $50,000 and deposited this sum in the Ohio Bank & Trust Company of Toledo.

After that, on the same day, and there is some dispute about the time, Mills endorsed the interest-bearing certificate on The Security Home & Trust Company and caused the amount thereof to be placed in the commercial or checking account of that Bank and then caused $300,000.00 to be deposited out of that account, and in the Ohio Savings Bank & Trust Company.

The first $50,000.00 was placed to the credit of The City Machine & Tool Company and the second $50,000.00, and the $300,000.00 was placed to the credit of The Auto Stamping Company in The Ohio Savings Bank & Trust Company.

These transfers were not made for the purpose of paying any obligations of The City Auto Stamping Company, but for the purpose of opening a new commercial account in that bank. This transfer of funds was accomplished by Mills endorsing the checks, as Treasurer of The City Auto Stamping Company, and securing a junior official of the Bank to exchange for two drafts drawn on the Ohio Savings Bank & Trust Company.

Mills proceeded to make the draft to The Ohio Savings Bank & Trust Company, opening accounts for each of the companies of which he was treasurer and depositing a draft for their account. In order to do this with the $300,000.00 certificate of deposit, Mills deposited the certificate in the commercial account and then drew a check on the commercial account obtaining for this check, a draft for $300,000.00, as before stated, and in order to get the money due The Ohio Savings Bank & Trust Company on that day to pay these drafts, Mills called by telegraph or telephone reserve banks of The Security Home & Trust Company in New York, Cleveland and Toledo, to transfer certain amounts of the reserve funds of that bank to The Ohio Savings Bank & Trust Company.

It will be seen from this transaction that Mills at least believed that it would not be safe or probably speedy enough to make this transfer by checks, which would be the ordinary way of doing business,

which would pass through the Clearing House and not be paid until the next day.

It will be seen then that The City Auto Stamping Company had nothing to do with this transaction by its Board of Directors or any other officer, except Lint, its president, and Mills, its treasurer, and that the checks were not drawn in the ordinary course of business, but in order to transfer the actual funds from The Security Home Trust Company to The Ohio Savings Bank & Trust Company, this so-called "rapid transit" course was pursued.

There can be no doubt but what the uppermost thought in the minds of Lint and Mills in making this transfer was a failing condition of The Security Home & Trust Company and the knowledge of this condition was derived from their positions as directors and officials of that institution.

The $300,000.00 was drawn by Mills late in the day after he knew of this heavy run upon the bank, without any authority from The City Auto Stamping Company, except that he was a director of that Company and from the time in the day and the manner in which the amount called for by the two checks which Lint had given him the day before, the fair presumption is that he was only to use these checks if he thought there was danger of The Security Home & Trust Company failing.

Mr. Fulton testified:

"I think from our conversation with both committees they had a feeling, and we had after talking with them, that they had exhausted about every resource that they could for themselves and they had already reached the point where it required some outside assistance, and unless that could be obtained we didn't see how they could help themselves enough to carry on."

And further, he testified with respect to what occurred at the Directors' meeting on the morning of June 18th:

"My recollection is that is about the only matter we took up in the Bank at their meeting in the morning, and they turned it over then to their executive committee. The executive committee in turn appointed another committee, three to go with us during the day and see what we could work out. After working with the other banks we called a meeting of the Clearing House association late in the afternoon of Tuesday and seemed to be unable to get any help at all for the affairs of the Security Bank, and then it was decided at a later

meeting of the Board that evening when they voted to have the Department of Banks take over their bank for liquidation."

Mills testified in regard to the condition of the Bank:

"Q. Were you attempting to stop withdrawals?
A. Yes, sir.
Q. But if the doors were closed against the proposed merger, was there anything else, any other plan, to get this new lease on life that you or your sub-committee was working on? A. Not to my knowledge."

He was speaking of the attempted merger with The Toledo Trust Company, of which Thompson was President.

There was further evidence of the knowledge of Lint and Mills of the insolvency of The Security Home & Trust Company on the same day Lint gave Mills a check on his personal deposit in the Security Home Trust Company for $15.528.30. The amount represented was withdrawn from this bank by Mills in currency. This amount was afterwards returned to the liquidator of the bank.

There is a fair presumption that Mills at the time he caused these deposits of The City Auto Stamping Company to be withdrawn from The Security Home & Trust Company, believed from his knowledge as director and an official of that company, that it was insolvent and would not be able to open its doors on the morning of the 17th, and that these deposits were withdrawn for the purpose of preferring The City Auto Stamping Company in preference to other depositors of the banking company.

Can it well be doubted that both Mills and Lint who carried on these transactions, that both, at the time, doubted the solvency of The Home Trust Company and that the haste in transferring these funds to the Bank and Trust Company was induced by their knowledge of the real situation, no obligations were to be satisfied; it is simply the unexplained transfer of this unusually large fund from a failing bank to a solvent one. Mills could not have helped but know that the withdrawal of this enormous sum of $400,000.00 would further embarrass or wreck this Bank already tottering to its fall, no process of reasoning can justify such course of conduct by bank officials. Mills knew and Lint knew as officials and directors that a

failure was at hand because it occurred the very next day; they knew the facts and sought to profit by them. General depositors are not shown to have had this knowledge, although there was a "run on the bank." Numerous cases are cited by both parties, some of which are as follows, although no attempt will be made to review all these cases, some hold that a bank is insolvent when it can not pay its debts and depositors in the usual and ordinary course of business.

Steele v Allen, 134 NE, 401;
State v Childres, 212 NW, 63;
Commonwealth v Hargis B. & T. Co., 26 SW (Sec. Ed. 1045).
As to the right of officers or directors to be preferred as creditors:
Annotation, 19 A.L.R., 334, 338;
Annotation, 38 A.L.R., 92;
Annotation, 48 A.L.R., 479;
Annotation, 56 A.L.R., 207;
19 L.R.A. 353, 354, directors' interest in the debt;
Sack v Northwestern Bank, 74 A.S.R., 841, 843;
Walker Bros. v Eastern Motor Co., 262 Pac., 97;
Manufacturing Co. v Sterling Co., 41 A. T.L., 294;
Clark Co. v Colton, 49 L.R.A., 699, 703;
Conover v Hull, 39 Pac., 166;
Rowevs. Tenthold, 77 NW, 153;
Swentzel v Penn Bank, 23 A.T.L., 405.
It will be observed that the decisions in this country are not uniform, even where a preference is given by a corporation to the members of its Board or its officers, in contemplation of insolvency or when its directors and officers are personally interested in the preference.

However, the weight of authority and the better reasoning are with those that hold that a preference under such circumstances can neither be given to an officer or director when directly or indirectly interested.

It is clear from the facts in this case that this does not come under the principle of a commercial corporation having one or more common directors with a banking institution, withdrawing funds from a failing bank through knowledge which the first corporation received of the insolvency of the Bank from a director, but it comes under the principle that directors of a bank believing the bank insolvent and that it could not continue to do business, attempting to prefer another institution in which these directors are personally interested.

It might be further noted from the brief of the Superintendent of Banks, that on the 16th of June, there was drawn out of this Banking institution by the directors and officers either of their own or of corporations and others in which they were interested the sum of $688,000.00, indicating that the directors and officers who were connected with the management of this Bank, believed that it would be unable to continue to do business.

The principle is well established that directors and officers can not prefer themselves or other persons or corporations in which they are interested, and this is especially true in states in which the trust principle is adopted with reference, first to stockholders and, second, when the corporation becomes insolvent for depositors.

**Star Hardware & Supply Co. v Toledo Steel Castings Co., 90 Oh St, 171;**

**Thomas v Matthews, 94 Oh St, 32, 43.**

Referring to the case of **Rouse v The Merchants National Bank, 45 Oh St, 493,** which defendants claim much for, it may be noted that in the syllabus the Supreme Court says:

"A corporation for profit after it has become insolvent and ceased to prosecute the objects, can not make a preference."

The action of the corporation that the Supreme Court was then considering was insolvent and had ceased to do business, so that the Supreme Court makes the syllabus and the decision correspond with the facts.

It would seem that it does not limit the prohibition against preference to a company that has both become insolvent, and ceased to prosecute its business, but under some circumstances, at least, the prohibition might apply where it was insolvent and the Supreme Court so indicates this principle in the case of **Damaryn & Co. v Huron Iron Co., 47 Oh St, 581.**

Cases are cited which might seem to sustain the contention of plaintiff in error, but all these cases will be found to be under a statute, while the instant cases are not, some of these cases come more nearly sustaining the claims of defendant in error, in fact the strong weight of authority is with defendant in error. Mr. Morse in his recent work on Banks and Banking is clearly to this effect and in 2nd Morse on Banks and Banking, in part of §623, p. 310, observes as follows:

"A bank is in **contemplation of insolvency** reasonably when the fact becomes apparent to its officers that it will presently be unable to meet its obligations. When the transfer under consideration was made, such knowledge existed (though the officers might hope otherwise), and the **natural and probable consequences** of the transfer was a preference; and since every person is presumed to intend the natural and probable consequences of his own acts, there was a legal intent to prefer, and this can not be remitted by showing another motive. The object of the law is to secure equal distribution and prevent conduct which the actor can perceive in the exercise of reasonable foresight will prevent the fulfillment of that object."

· Roberts v Hill, 23 Blatf. 191; 23 Fed., 311.

The author, familiar with banking laws, and having made an exhaustive study and research of the same, reaches the foregoing conclusion and announces it as a sound principle of law and while under a statute, how fairly it covers the instant case. It will not do to say that because the bank was open on the 16th of June, and many persons made withdrawals, that the bank was ostensibly solvent, that Mills is in the same class with general depositors because he was "on the inside" and knew the truth, and he and other officers **must** have known that the bank must fail and he especially when he drew out that day $400,000.00.

The conduct of Mills and Lint was not in harmony with proper banking and can not be sustained in either law or equity, therefore the judgment must be affirmed.

POLLOCK, J, concurs.
ROBERTS, J, dissents.

(Judges Roberts, Farr and Pollock of the Seventh Appellate District, sitting in place of Judges Lloyd, Richards and Williams of the Sixth Appellate District).

ROBERTS, J.

The two above entitled cases are in this court on petition in error, seeking reversal of the judgments therein rendered by the Court of Common Pleas, in favor of the defendant in error and against the plaintiff in error. The parties occupy inverse positions in the title as compared with their positions in the Court of Common Pleas. In these two actions the parties are the same. These actions involve the same issues, were submitted, considered and determined by the Court of Common Pleas together, were so argued and submitted in this court, and will be considered and de-

termined in like manner. The only difference between these two cases is that there was some difference in the manner of the withdrawal of the funds by the plaintiff in error from the bank, as hereinafter explained, which forms the basis of the action. The parties will hereinafter be designated as plaintiff and defendant as they appeared in the title in the Court of Common Pleas, unless desirable to otherwise more particularly name them.

These actions were commenced in the Court of Common Pleas on the 2nd day of September, 1931, against The City Auto Stamping Company, seeking to recover the sum of $50,000.00 withdrawn on June 16, 1931, from a deposit account of The City Machine & Tool Company, which, about that time, had consolidated or merged with The City Auto Stamping Company, and in another action against the same defendant, to recover two items, one of $50,000.00 and one of $300,000.00 from deposit credits of The City Auto Stamping Company, each of these accounts or credits being in The Security Home Trust Company.

There is no particular dispute of fact in this case. The issues develop in different constructions of the law and rights of the parties as arising from practically undisputed facts, and further involve a determination of the motives and intentions of the parties on the withdrawal of the funds above mentioned. It is alleged in the petition that:

"On and prior to June 16, 1931, The City Machine & Tool Company was a depositor in The Security-Home Trust Company and on said date had a deposit balance to its credit on its commercial account with said bank in the sum of $91,860.46 on said date, to-wit, June 16, 1931, when said bank was hopelessly insolvent and was then known by said bank and by the officers and directors thereof to be insolvent, The City Machine & Tool Company, by means of its check, executed on said date in and for the sum of $50,000.00, drawn on said bank, was signed and countersigned respectively, by one Amos Lint and Raleigh D. Mills, who at said time, and for a long time prior thereto, were directors of said bank, The Home Security Trust Company, and were at said time officers and directors of The City Machine & Tool Company. * * *

Plaintiff says that said money, to-wit, the sum of $50,000.00, was not withdrawn by The Security-Home Trust Company, nor paid and transferred by said bank to and for it in the ordinary course of business of said bank or of The City Machine & Tool Company with said bank, but that the withdrawal, transfer and payment of said sum of money from the moneys, property and assets of The Security-Home Trust Company were made with knowledge on the part of the said bank and said City Machine & Tool Company, of the said Amos Lint and Raleigh D. Mills, individually and as directors of the said bank and as officers and directors of The City Machine & Tool Company, of the fact that The Security-Home Trust Company was then insolvent; and the withdrawal, transfer and payment of said money, as aforesaid, were made by said The City Machine & Tool Company and by the said The Security-Home Trust Company in contemplation of the insolvency of the said bank, and with the design, intent and purpose on the part of the bank and of the said The City Machine & Tool Company to give the said The City Machine & Tool Company preference over other depositors and creditors of the bank at the time of the withdrawal, transfer and payment of said money, as above alleged, to the exclusion of such other depositors and creditors."

The Security-Home Trust Company was a banking corporation and Trust Company located in the city of Toledo, incorporated under the laws of Ohio and engaged in a general commercial savings and trust business. It was the result of a consolidation of The Security Savings Bank & Trust Company and The Home Bank & Trust Company and other banking institutions. In connection with its main or principal place of doing business it had ten branch banks located throughout the city of Toledo. Presumably as a result of this consolidation and a retention of the directors of the original banks in the consolidation, it had a board of directors consisting of forty members. Adam R. Kuhlman was Chairman of the board. Stacey L. McNary was president. It had four vice-presidents, of whom Raleigh D. Mills, before mentioned, was one.

Early in the year 1931 the bank lost some accounts of considerable amount, presumably owing, in part, to the merger, and perhaps principally to business depression and the general decline of bank deposits. As a result of this condition The Security-Home Trust Company borrowed large sums of money amounting in February, 1931, to approximately $3,500,000.00. Rumors were current throughout the city concerning this and other banks, which created, to some extent, fear and suspicion on the part of

74

depositors. The bank resorted to calling loans, liquidating mortgages and selling securities. During March and April, 1931, its position had been improved and its borrowing reduced to less than two million dollars. It is claimed, and not understood to be disputed, that its reserves were at all times up to or in excess of legal requirements. In May and the fore part of June there were further withdrawals and increased loss of deposits and the bank resorted to further liquidation of securities. On June 16, 1931, a run was made on the bank, resulting in large withdrawals of deposits. On the evening of that day the bank was turned over to the Superintendent of Banks, the plaintiff herein, to conserve its property and the interests of its depositors. The bank continued to do business throughout the 16th of June, 1931. Its usual closing hour was two-thirty in the afternoon but on this day it remained open, paying all demands made upon it, until four-thirty, P. M., no one being turned away unpaid.

On the said 16th of June the two constituent companies comprising the defendant, The City Auto Stamping Company, were depositors of the bank, and when the word bank is herein used it will be understood that reference is made to The Security-Home Trust Company. The Machine & Tool Company then had on deposit $193,527.00 and The City Auto Stamping Company, $359,295.65. These two companies had the same officers and directors, Amos Lint being president of each and Raleigh D. Mills treasurer of each. The board of directors of each company consisted of seven members, including Mr. Lint and Mr. Mills, who, with two other directors of these companies, were also directors of the bank, and Mr. Mills was a vice-president of the bank.

It is undisputed that the withdrawals mentioned were made by Mr. Mills, treasurer of the two companies, in three separate transactions, two of $50,000.00 each and one of $300,000.00. The two smaller withdrawals were made about or a little after noon of said day by two checks drawn by The City Machine & Tool Company and The City Auto Stamping Company respectively, which were given to Mr. Mills, treasurer, at the office of the companies, by Mr. Lint, the president, on the afternoon of June 15th, with instructions to Mills to open new accounts for these two companies in The Ohio Savings Bank & Trust Company. These checks were endorsed by Mills as treasurer of the companies, taken by him to the bank, and in

exchange therefor he received two drafts on The Ohio Savings Bank & Trust Company, which he took to that bank and opened accounts for the said two companies, depositing the drafts to their credit. In the afternoon of said day, the president of these companies being out of the city, Mr. Mills took a deposit demand certificate of The City Auto Stamping Company, in his possession as treasurer, deposited it in the commercial account of the company in the bank, drew a check on this account for $300,000.00 to the bank, for which he received a draft for said sum on The Ohio Savings Bank & Trust Company. The parties are not in accord as to when this draft was secured at the bank, it being claimed by the plaintiff that it was late in the afternoon, and by the defendant that it was early in the afternoon. The bank regularly closed at two-thirty, and the evidence indicates that it is a reasonable conclusion that the draft was secured earlier than that time. The bank did not have funds in The Ohio Savings Bank & Trust Company to meet the draft thus drawn on it. The bank then sent telegrams to its depositories in Chicago, Detroit, Cleveland and New York and by telegraph secured a transfer of funds from these depositories to The Ohio Savings Bank & Trust Company sufficient to pay the demands thus made.

The plaintiff seeks a recovery of these amounts so withdrawn from the bank for their application generally to the creditors of the bank, claiming that the conduct relating to the withdrawals was illegal and void and resulted in a wrongful preference in favor of the defendant.

There is no dispute between the parties concerning the manner in which the withdrawals were made, as above stated. The plaintiff in the petition alleged that the withdrawals were made "when the bank was hopelessly insolvent and was then known by said bank and by its officers and directors thereof to be insolvent." It is not understood that the plaintiff is now claiming that the bank at the time of these transactions was actually insolvent. It is said in behalf of the plaintiff, referring to the withdrawals, "That this was done in contemplation of the insolvency of the bank, to the knowledge of the officers and directors, who acted on behalf of said companies in withdrawing their funds from The Security-Home Trust Company." Again it is said in the brief,

"That the withdrawal, transfer and payment of this sum of money was made by

The City Machine & Tool Company and The Security-Home Trust Company in contemplation of the insolvency of the bank and with the design, intent and purpose on the part of the bank and The City Machine & Tool Company to give to The City Machine & Tool Company a preference over depositors and creditors of the bank."

Plaintiff in brief further expressly disclaims any intention to predicate a right of action on or seek any consideration by reason of the so-called preference statutes, namely §§11104 and 11105 GC. The issue in this action is predicated upon the three withdrawals from the bank, before mentioned, and is whether they were, as claimed by the plaintiff, the result of fraudulent collusion on the part of the creditor and the debtor, whereby an unlawful preference resulted, or whether, as contended by the defendant, the withdrawals were in · good faith within the legal rights of the defendant, and without collusion or intention to create or result in a wrongful preference of this depositor over the general creditors of the bank.

The only evidence offered in the trial indicative of the actual financial condition of the bank consists of the daily statements of condition (Exhibit 2) showing its assets and liabilities from January 2, 1930, for each day down to and including June 16, 1931. This indicates that the bank had a net valuation of property and assets several million dollars in excess of its liabilities, and which would further tend to indicate its solvency. How the assets were valued, as compared with market values, the evidence does not indicate. This bank closed during a period of world-wide depression and very great shrinkage of values. What the actual value of its property at that time was, or could have been realized upon it if placed upon the market, is largely a matter of conjecture. The evidence indicates that the closing of the bank was not wholly, or perhaps to a considerable extent, the result of its precise financial condition, but was the result of unfortunate circumstances and environments resulting in the run of June 16th on the bank, and its being turned over to the Superintendent of Banks the following morning. Evidence was offered by the plaintiff that the double liability of stockholders had been assessed. This assessment was made nearly six months after the closing of the bank, during which period values had very materially declined, so that the real estate, the stocks, bonds,

mortgage securities, and otherwise, of the bank, would be of very much less market value at the later period when the assessment was made, as compared with values preceding the closing of the bank.

Undisputed facts leading up to and culminating in the closing of the bank may be stated substantially as follows: supplementing what has previously been said concerning the decline of the bank from the first of the year 1931, down to the time of its closing.

Apprehensive of the result of a run upon the bank, a few days prior to its closing, negotiations were commenced by its officials for a merger with The Toledo Trust Company. In a consideration of this prospective merger by Mr. Thompson, president of that company, and at his suggestion, Ernst & Ernst placed in the bank twenty-nine expert accountants for a determination of its condition, preliminary to a decision of the desirability of the suggested merger. The examination of these accountants evidently had not proceeded to such an extent as to indicate anything of particular value concerning the condition of the bank. However, the presence of this large number of accountants working upon the books evidently had a disturbing effect upon the public concerning the condition of the bank. On the morning of June 15th a conference was had between the officers of the bank and Mr. Thompson, president of The Toledo Trust Company. The desirability of the presence ·of the superintendent of banks was suggested by Mr. Thompson, and that any consolidation would necessarily be subject to his approval, and that his presence be requested. Mr. Fulton, the superintendent, was called upon the telephone. He arrived in Toledo about eight o'clock in the evening of that day, after talking with President McNary and then with Mr. Thompson. Later in the evening he telephoned another officer of the bank and instructed him to call a meeting of the board of directors at eight-thirty next morning. This meeting was held at that time in the directors' room of the bank, attended by nearly all of the forty directors, and upon his request, authority was given the superintendent to discuss the prospective merger of the bank with other banks in the city or with the clearing house. The executive committee, which consisted of ten members, then met and appointed an executive sub-committee consisting of three members. About noon of June 15th Mr. Thompson declined to go further with the merger. Conferences continued during the afternoon with the clear-

ing house and perhaps other banks. Another meeting of the directors was held about eight o'clock in the evening. The effort to secure a merger with the other bank had failed, no relief had been afforded by the clearing house, a suggestion was made that the bank declare the sixty-day time limit for the payment of savings accounts, which Mr. McNary refused to consider. A resolution was subsequently passed that evening turning the bank over to the superintendent of banks to conserve its assets. During the run on the bank on June 16th it was hoped to secure additional security and transfer of funds from its depositories and branch banks, the total loss of deposits that day amounting to about $1,675,000.00, about one million of which was paid out in cash over the counter.

There is no dispute but that the bank up to the time of its closing had paid every demand upon it. There is no evidence in this case indicating that the closing of the bank and turning it over to the superintendent of banks had been contemplated or thought of by its board of directors or officials until the meeting of the directors in the evening and immediately preceding the passage of the resolution for that purpose. The bank still had on hand in cash, clearings and deposits at its reserve banks in a considerable sum, which is figured by the defendant as being $1,398,000.00.

It seems quite apparent that the bringing in of this large number of accountants a few days previously to work on the bank books and the meeting of the directors at eight-thirty in the morning, in connection with previous rumors concerning the condition of the bank, had a very disturbing effect upon the public and resulted in the run before described.

Each party has cited the case of **Rouse, Trustee v Merchants' National Bank, 46 Oh St, 493,** with expressions of confidence that it supports the conflicting contentions of the parties to this action. The syllabus in this case reads as follows:

"A corporation for profit, organized under the laws of this state, after it has become insolvent, and ceased to prosecute the objects for which it was created, cannot, by giving some of its creditors mortgages on the corporate property to secure antecedent debts without other consideration, create valid preference in their behalf over other creditors or over a general assignment thereafter made for the benefit of creditors."

This is recognized as a leading authority in Ohio, upon the proposition as to when the assets of a corporation become trust fund for the benefit of creditors and when a preference can not be given to one creditor as against the interest of other creditors. This is not a case involving the proposition of the withdrawal of deposits from a bank, but where a bank had obtained security from a manufacturing and supply corporation for indebtedness to the bank. It will be observed that the syllabus above quoted is to the effect that a preference can not be made when the corporation has become insolvent and has ceased to prosecute the objects for which it was created. The statement of the issue is found in the opinion, page 498, as follows:

"The claim of plaintiff in error is, that when the corporation becomes insolvent and ceases to carry on business, its property and assets constitute a trust fund for the benefit of its creditors, and directors in possession of the corporate property, being trustees for all the creditors, cannot lawfully dispose of it otherwise than for the equal benefit of all corporate creditors. The defendant in error, upon the other hand, contends that when not restricted by the law of their creation, or prevented by the operation of some bankrupt or insolvent law, insolvent corporations may, the same as natural persons, make preferences among their creditors." Decisions of courts will be found maintaining each of these diverse positions. The precise question has not been decided in this state, and in view of the conflict of authority elsewhere, we are at liberty to adopt that rule, which best harmonizes with the policy and legislation of the state, rests upon the sounder reason, as we conceive it to be, and coincides with our sense of justice and right."

The two conditions of a corporation being insolvent and having ceased to function are referred to in the opinion on page 507, as follows:

"Without extending the discussion, we are of opinion that when a corporation for profit, organized under the laws of this state, becomes insolvent and ceases to carry on its business or further prosecute the purposes of its creation, the corporate property constitutes a trust fund for the equal benefit of the corporate creditors, in proportion to the amount of their respective claims; and that it can not then, by pledge or mortgage of the property to come of its creditors as security for antecedent debts, without other consideration, create valid

preferences in their behalf, over the other creditors, or over an assignment thereafter made for the benefit of creditors."

Substantially the same statement is again elsewhere made in the opinion. It is said, however, in the opinion, commencing on page 508:

"Whether an insolvent corporation, which is still a going concern, and in good faith engages in the prosecution of its business, may borrow money, or contract, or procure an extension of other bona fide indebtedness, and convey or pledge the corporate property in security thereof, is a question not involved in this case and upon which we express no opinion."

In applying this decision to the issues in the instant case it should be borne in mind that in this case it is contended by the defendant that the bank was not insolvent and that it had not ceased to do business, or, in the language of the syllabus in the Rouse case, "had not ceased to prosecute the objects for which it was created." As before stated, it is not understood that the plaintiff is now contending that the bank was actually insolvent but that it made or permitted these withdrawals in question in view of impending insolvency.

In this situation it becomes pertinent to consider the general rule as established by decisions generally as to the necessity of the existence of these two conditions, namely, insolvency and a ceasing to perform the functions of its business. The Rouse case recognizes the fact that the decisions in the various states are not uniform. It is said in Thompson on Corporations, 3rd Ed., Vol. 8, §6132, under title, "Effect of Insolvency on Power to Prefer Creditors",—

"The courts are not agreed on the question of the power of a corporation on its mere insolvency to prefer creditors. One reason of this disagreement, and perhaps the principal one, is on the view that the various courts take of the so-called trust fund doctrine. The courts that adhere tenaciously to this trust fund theory consistently hold against the power of the corporation, on its insolvency to prefer creditors, while some of the courts that have repudiated the doctrine utterly go to the other extreme and hold that a corporation known to be insolvent may prefer any of its creditors, including its officers and directors. And there is still another class composed of both the former classes,

that take a middle ground and hold that up to a certain time or point in its insolvency, a corporation may prefer its creditors, as a result of the cases collected they may be arranged into three classes:

"1.   The courts which adhere to the trust fund doctrine consistently hold that on the mere insolvency of a corporation its assets become a trust fund for the benefit of all of its creditors, and that from that time no preference can be made in favor of any single creditor. * * *

2.   When a corporation has become so far insolvent that its managing officers find themselves obliged to deal with its assets in view of a suspension by reason of such insolvency, and when by reason thereof it has in fact ceased or suspended its corporate business, its assets then so far become a trust fund that no preference can thereafter be made to any creditor. Holding in effect, on the other hand, that so long as the corporation is a going concern, engaged in the conduct of its business for which it was incorporated, and not known or believed by its managers to be insolvent, it is not prohibited from making a preference, although its liabilities at the time may, in fact, exceed its assets."

3.   The third and perhaps the smaller class of cases holds that the insolvency of a corporation does not prevent its directors from preferring a corporation creditor, or even themselves, until the corporate assets, by an appropriate action, by a proper party, have been taken possession of by a court of equity for the purpose of settlement and distribution to all creditors."

A perusal of the authority just quoted, and an examination of authorities cited, indicate that the more general and prevailing rule is the one denominated as number two, and   **Rouse v Merchants' National Bank, 45 Oh St, 493,** is cited as an authority for this rule.   This further tends to the conclusion that the two requirements of the Rouse case, namely, insolvency and a cessation of business, are essential preliminary to the creation of a trust of the property of the corporation, and thus preventing preferences, and further tends to indicate that where the Supreme Court, in the opinion of the Rouse case, on page 508, queries whether an insolvent corporation, which is still a going concern, may be considered exempt from the inability to secure preference otherwise therein indicated, should be answered or construed to the effect that the cessation of business

would be and should be considered essential.

Section 6179 of Thompson, before cited, under the title "Preferences while corporation is going concern," reads in part as follows:

"It is very generally conceded that a corporation though in fact insolvent and without sufficient assets to pay its debts, but is still engaged in business and carrying on its corporate enterprise, may under such circumstances secure or prefer a particular creditor. And it may be noted that some jurisdictions that are still stuck to the trust fund doctrine concede this power to an insolvent corporation where it is a going concern.

A corporation is authorized to deal with its property and to transfer it for value in due course of business, though it is clearly insolvent, so long as there is an honest intention and a reasonable expectation on the part of its managers to save it from ultimate ruin. A corporation under such circumstances may continue its operations and pay off and discharge debts in the regular course of business, though a part of the creditors may be thereby deprived of their security and may subsequently and ultimately be unable to collect their claims.

Preferences by such corporations are upheld on the theory that the assets do not become a trust fund so long as the corporation continues its business and while there is no contemplation on the part of the managing officers of ceasing business by reason of such insolvency. That is, so long as the corporate assets are dealt with without the contemplation of insolvency or permanent suspension of business, and while it proceeds in the usual course of trade, such preference may be made."

Then follows a quotation from Freeman to the same effect. Then the text further says:

"So the mere excess of liabilities over assets will not prevent a corporation from giving security to a general creditor while it is a going concern."

In §6141 of the same authority, it is said:

"Another and familiar illustration and one utterly inconsistent with any trust fund notion, is found in the fact that an insolvent corporation may continue to make payments in due course of business. And it was admitted by a writer who was wedded to the trust fund theory, that such payments made in due course of business, with the expectation of being able to continue the same, were not fraudulent preferences; and an illustration given was one which was found in the case of a run on a bank which in the hope of resisting the run continues payment until its available resources are exhausted and then suspends. In such case it was admitted that neither the assignee nor receiver could maintain an action against the depositor who, even down to the last hour, has been fortunate enough to draw his deposit."

In §6142, it is said:

"It is very generally conceded that the legal status of a corporation as to its right to make disposition of its property is the same as a natural person. That is, acting within its corporate powers it has the same right to dispose of its assets as that of a natural person over his individual property."

In the case of Stone, Receiver of The General National Savings Bank v Jenison, 111 Mich., 592; 36 L.R.A., 675; 70 NW, 149, the syllabus reads:

"Payments to a depositor, during a run on a bank, and after the cashier has persuaded some persons not to withdraw their deposits, but when a bank has assets sufficient so that the officers hope and expect to continue business and to be able to pay all the debts of the bank, are not made with a view to prevent the application of the assets of the bank in the manner prescribed by statute or with a view to the preference of that depositor over the creditors, within the meaning of How. Ann. Stat. 3208, e6."

In the case of Tiffany, Trustee v James H. Lucas, 15 Wall. (U.S.), 410; 21 Law. Ed. 198, it is said in the syllabus:

"Two things must concur to bring the sale within the prohibition of the act; the fraudulent design of the bankrupt, and a knowledge on the part of the vendee, or reasonable cause to believe that it existed. If the sale was made in good faith, for an honest purpose, it is not within the condemnation of the law."

Another quotation is made as follows:

"The prima facie presumption of fraud and preference may be overcome by the uncontradicted evidence of the insolvent

and the aid of the creditor who acted in the matter of the transfer, showing that the transfer was made in good faith, and that there was no intent to make or secure any preference over the other creditors; the question of intent in such case being one of fact." Haas v Whittier, et, 97 Cal., 411; 32 Pac. 449.

"Where an insolvent debtor, who was ignorant of his insolvency, made a bona fide mortgage of real and personal property, not with the intention of closing his business, but rather with a view to continuing and extending it; it was held that this was not a conveyance made with a view to insolvency."
Utley v Smith, 24 Conn., 290.

"Sale made by an insolvent debtor who honestly believes he shall be able to continue his business, in payment of a just debt, and without a design to give a preference, is not fraudulent within the meaning of the second section of the United States Bankrupt Act of 1841, although bankruptcy should immediately ensue."
James v Howland, 8 Metcalfe, 377; 41 Am. Dec., 525.

"How can a payment or sale made in the ordinary and usual course of business by the company, one which would have been made had the company been prosperous and solvent, be said to have been made in contemplation of insolvency, although the company was at the time insolvent, which was known to its officers? The act being done in the ordinary and usual course of business by the company, uninfluenced by the state of its pecuniary affairs, it cannot be said to have been in contemplation of any particular condition of such affairs."
Dutcher, Assignee v The Importers & Traders National Bank, 59 N. Y., 9.

"In the absence of any inhibition statute, a debtor commits no fraud by appropriating his property to the satisfaction of one or more of his creditors to the exclusion of all others. Knowledge by both the debtor and the preferred creditor is of no weight in this connection. The only limitation on such transactions is that there can be no secret trust for the benefit of the debtor. Subject to that qualification, it is settled at common law that a debtor has a right to prefer one or more of his creditors over the other."

Cosmopolitan Trust Co. v Agoos Tanning Co., 245 Mass., 69; 139 NE, 608.

"A conveyance by an insolvent debtor in contemplation of insolvency, made with the design to prefer the purchaser to the exclusion, in whole or in part, of other creditors, the purchaser not knowing of such insolvency or of the design to prefer, but believing the vendor to be solvent, is valid. A conveyance made by an insolvent debtor in contemplation of insolvency, made with intent to hinder, delay and defraud creditors, the purchaser not knowing of such insolvency or of such fraudulent intent, is valid."
Caruthers et v Kennedy et, 121 Oh St, 8.

As to what constitutes insolvency of a bank, it is said in the case of Steele v Allen, 240 Mass., 294:

"A trader or a bank commonly is insolvent when not in condition to pay his debts in the ordinary course, as persons carrying on trade or banking usually do."

In Maggee on Banks and Banking, third edition, on page 604, it is said:

"The courts are generally possessed with a broad knowledge of the business and conditions confronting a bank and recognize the fact that if they are called upon to pay all indebtedness that they can not at once comply. Therefore they have sanctioned and now uphold the more reasonable rule that a bank is solvent when it possesses sufficient solvent and marketable assets to meet all its obligations and liabilities within a reasonable time. This reasonable construction of the law as applied to banks is now held by courts in many of the states to be the law determining a bank's solvency."

On page 619 of the same authority it is said:
"A run upon a bank by its depositors may occur at any time and without cause; but such occurrences are usually accompanied by statements that the bank is insolvent."
Such general statements made in this way do not constitute or establish insolvency and checks paid during such a run on the bank or paid out to a depositor during such a time cannot be recovered."

In 7 C. J., page 840, it is said:

"So long as a national bank is a going concern, carrying on its business as usual, and has committed no act of insolvency, and it does not appear that a present sus-

pension of business is contemplated by its officers, although it is actually insolvent, to their knowledge, payments or remittances made or caused to be made to a correspondent bank in the due course of its daily business cannot be said to have been made in contemplation of insolvency, or with a view to prefer the correspondent as a creditor within the meaning of the statute; * * * Nor will knowledge of a depositor that the bank is insolvent prevent his drawing out his deposit where he does so in good faith and without intent to secure a preference."

"Though Baldwin knew at the time that the bank was insolvent, yet the transaction being a bona fide purchase and not a plan to secure preference of the estate over other depositors, the transaction was not in violation of §5242 of the Revised Statutes of the United States, which forbids the transfer of any bills of exchange, etc., owing to any national bank, * * * after the commission of an act of insolvency or in contemplation thereof."

Tuttle v Frelinghuysen, 38 N. J. Equity, 12.

"It is a matter of common knowledge that banks and other corporations continue in many instances to do their regular and ordinary business for long periods, though in a condition of actual insolvency, as disclosed by subsequent evidence. Payments made in the due course of business by a bank which is actually insolvent, do not constitute valid preferences, if they were made not in contemplation of insolvency, but with a view to prefer one creditor over another."

McDonald v Chemical National Bank, 174 U. S., 609; Book 43, Law Edition, page 1106.

In connection with the Rouse case, that of **Damarin & Company, et v Huron Iron Co. et, 47 Oh St, 581,** is cited. The syllabus reads:

"A mortgage executed by a corporation to secure a pre-existing debt, is not, necessarily, invalid for the reason that the company was known to be insolvent, where the company is at the time in the possession of its property, and in the active prosecution of its business, unless prevented by other creditors; and the object of the mortgage is, on its part, not to give a preference to one creditor over another, but simply to obtain an extension of credit."

"A withdrawal of the funds of a corporation from a bank that is about to fail, upon a check signed by the president of the corporation, although he was also a director of the bank and his knowledge of its condition was acquired by him as such director, does not violate the stock corporation law, §48, which prohibits any transfer of assets or payments by the bank or any officer, director, or stockholder thereof, with intent to prefer any creditor, when the bank is insolvent or its insolvency imminent."

O'Brien v East River Bridge Co., 161 N. Y., 539; 48 L.R.A., 122.

In the opinion of the above cited case it is said:

"But the question is, did the defendant, in drawing its check against the deposit, violate any law or perpetrate any wrong? If it did not, then the participation of one of the bank directors in the transaction can not change the situation. It would, I think, be an unwarranted construction of the statute to hold that a depositor in a bank, who has withdrawn the deposit on learning that the bank was about to close, is liable to be sued for the money, whenever it can be shown that he acted upon information given to him by a director of the bank; and yet the judgment now under review can not very well be sustained without such a construction, or that in substance."

In this connection see also Leach, Superintendent of Banking v Bazley et, 201 Iowa, 337.

For a general discussion of the right of corporation to prefer creditors, in annotations citing many cases, see 19 A.L.R., 320; 38 A.L.R., 90; 48 A.L.R., 479; 56 A.L.R., 207.

Reverting now to the facts in the case, as shown by the evidence, and construing the rule as to insolvency as not to mean, in case of a bank, an immediate inability to respond to all demands in case of a run, but to be determined after a reasonable opportunity to arrange its assets to pay the demands so made upon it, a corporation other than a bank does business largely with its own property, a bank does business largely upon the deposits made with it, subject at any time to demand for return. But few banks, presumably, could survive a serious run without assistance, which is difficult to obtain under present conditions. A bank must reinvest its deposits to profit thereby and cannot at once secure a return of loans. Hence, the necessity for a reasonable time to adjust its affairs within

which it may survive and again prosper. Thus the calamity of a bank failure may be averted. If a bank may be held to be insolvent when it can not meet all demands as made in case of a run on it, and thereby go out of business, wide-spread calamity would result. Without evidence as to the value of the property of The Security-Home Trust Company it can not be said that it was insolvent when these payments were made. It is not disputed that it was still functioning regularly when it made the payments in question and met all demands until it closed some hours later than the regular closing time. It is true that its officers were apprehensive and were, during the 16th day of June, seeking some alliance or arrangement by which it could strengthen its position. There is no evidence that a closing of the bank, or turning it over to the Superintendent of Banks, was anticipated or thought of until about eight thirty P. M., June 16th.

It is strongly urged that these payments were not made in the regular conduct of the business; that the deposit of the $300,-000.00 certificate, taking credit therefor, then giving a check with which to purchase a draft on The Ohio Savings Bank & Trust Company, and then by telegrams to its depositories in several cities having funds sent by wire to The Ohio Savings Bank & Trust Company to meet the drafts, was a scheme to fully complete the deal that day, and that in the ordinary course the transfer would not have cleared until the next day, too late to have completed the withdrawal and transfer to the other bank. Was there anything strange or unusual in the circumstances? The bank needed its available cash on hand to meet, over the counter, other demands being made upon it, and by the means adopted it accommodated its other depositors by retaining the amount of the draft in the bank and thus made possible its payment.

In this connection it is interesting to note that on June 1, 1932, since the submission of this case, the Supreme Court of Ohio rendered a decision in the cases of Fulton, Superintendent of Banks v B. R. Baker-Toledo Co., 23423, and Fulton, Supt. of Banks v Blodgett, 23424. The syllabus in these cases is as follows:

"1. It is the true intent and meaning of §713, GC, that a check drawn by a depositor against a deposit in any banking institution incorporated under the laws of this state, or any unincorporated bank doing business within this state, whether such deposit is in a checking account or a savings account, and used in the purchase from such banking institution of a draft upon another banking institution, shall entitle the owner and holder of such draft to preference and priority of payment out of the assets of such bank, from the time such check is charged to the account of such depositor.

2. The validity of such preference is unaffected by the purpose for which the draft is used."

It follows therefore that the defendant company, in purchasing a draft from The Security-Home Trust Company on The Ohio Savings Bank & Trust Company, completed the transaction, and its right to preference was established without its being presented at the bank on which it was drawn or the having of funds there available for its payment.

An individual or corporation in selecting a bank with which to do business, or in which to deposit funds, naturally looks for stability and security, and should the bank so selected lose its reputation for safety and be looked upon with suspicion, deservedly or otherwise, it is prudent and wise to shift to another bank, presumably offering greater security. It will not be disputed that it was commendable prudence for individual depositors to withdraw deposits from The Security-Home Trust Company under the circumstances culminating June 16th. It was their right to so do while it was a going concern. The situation is precisely the same with corporation depositors. However, it is urged that the withdrawals in question were the result of collusion between the officials of the bank and the defendant company, Mr. Lint and Mr. Mills being directors in both, and Mr. Mills being treasurer of the defendant company, and that Mills wrongfully and fraudulently sought, by making the withdrawals, to create a preference in favor of the defendant company, in withdrawing what had become a trust fund for the creditors of the bank generally, by reason of its alleged insolvency. It is not understood to be claimed that if Mr. Lint and Mr. Mills had not been officers and directors of the bank, and funds had been removed in like manner as other depositors not connected with the bank, that this action could be successfully maintained. It was not illegal for these men to be directors of both the defendant company and the bank. It is the general desire and conduct of banks to secure as directors men who are directors

of other important business concerns, thereby facilitating profitable business connection. Directors and officers so acting should observe the utmost good faith and not act so as to benefit one at the expense of the other. Such dual capacity naturally tends to create suspicion under such conditions. There does not seem, from the evidence, to have been an effort to disclose or determine the controlling motive of Lint or Mills in transferring the funds. The evidence simply shows the shift, as before stated. What interests they had in either the defendant company or the bank is not shown. It is not apparent that they acted as officers of the bank to create a preference for the company, to the loss of the general creditors of the bank. They had knowledge of the condition of the bank as its officers, and also from the distrust of the bank, which was a general sentiment of the public. If Mills had not been connected with the bank the desire to withdraw the deposit by the draft probably would have been as great. It is not indicated by the evidence that the withdrawal was otherwise than the desire and act of the defendant company, under the prevailing public opinion, simply as creditors, uninfluenced and unaided by any one representing the bank. Mills went to the bank as any other person might have done, checked out and bought the draft, dealing with the employes, not officers, in so doing, and without knowledge of other officials of the bank, so far as the evidence indicates. In other words, it is not indicated that the conduct of the defendant company was otherwise than would have been the conduct of any other creditor with similar knowledge of how to accomplish the desired result. If such be the fact, then the bank did not create a preference, but a depositor merely withdrew his deposit.

In conclusion, the evidence fails to sufficiently establish propositions essential to a right of recovery of the funds so withdrawn, by the Superintendent of Banks, and the judgment of the Court of Common Pleas in favor of the Superintendent of Banks is against the manifest weight of the evidence and its judgment should be reversed.